## CHARLES S. HUNT v. DR. HOWARD BRADSHAW.

(Filed 26 August, 1955.)

**1. Physicians and Surgeons § 14—**

A physician or surgeon may be held liable only for such damages as proximately result from his failure to possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess, or his failure to exercise reasonable care and diligence in his application of his knowledge and skill to the patient's case, or his failure to use his best knowledge in his treatment and care of the patient.

**2. Physicians and Surgeons § 19: Evidence § 48—**

Whether an operation should be undertaken in a given case relates to a field of expert knowledge and is subject only to expert testimony.

**3. Physicians and Surgeons §§ 16 and 20—**

Plaintiff had a small piece of steel imbedded in his chest about ¾ of an inch from his lung and about 4½ inches from his heart. Plaintiff introduced expert medical testimony to the effect that such foreign objects tended to migrate in the body, and that it was within the realm of good surgical practice to operate for the removal of such objects, although one expert testified in response to a hypothetical question that in the absence of pain or fever, etc., he would be inclined not to operate in such instance. *Held:* Plaintiff's own evidence fails to show that defendant surgeon was negligent in advising the operation.

**4. Same—**

In regard to an operation for the removal of a small foreign object from plaintiff's body, expert testimony to the effect that additional X-rays might have been desirable, but that the witness could not say that more X-rays were necessary or might have located the object more exactly, does not

.tend to show that good surgical practice required additional X-rays in such instance.

**5. Same—**

The statement of a surgeon to his patient that the contemplated operation was very simple, while plaintiff's expert testimony is sufficient to support a finding that the operation was of a very serious nature, *is held*, under the facts of this case, insufficient to show such want of ordinary care on the part of the surgeon as to import liability.

**6. Physicians and Surgeons § 19: Evidence § 48—**

Proof of what is in accord with approved surgical procedure, and what constitutes the standard of care of a surgeon in performing an operation, relate to expert knowledge and may be established only by the testimony of qualified experts.

**7. Physicians and Surgeons § 20—**

The doctrine of *res ipsa loquitur* does not apply to untoward results of an operation.

**8. Same—Evidence held insufficient to establish that unfortunate result of operation was caused by negligence.**

Plaintiff's evidence tended to show that defendant surgeon advised an operation to remove a small foreign body from plaintiff's chest, that prior to the operation plaintiff was in apparent good health, without pain or fever, that the foreign object was not removed, and that after the operation plaintiff discovered he had lost permanently the use of his arm. Plaintiff's expert testimony was to the effect that the location of such foreign bodies in an operation was very difficult, that the best surgeons frequently failed to locate them, that the loss of the use of the arm was a result of ischemia, which could occur in exploring a brachial plexus without the cutting or incision of a nerve, and that such results were not unlikely in the performance of an operation in the region of the brachial plexus. *Held:* Although plaintiff's evidence is sufficient to justify a finding that the injury to his hand and arm resulted from the operation, it is insufficient to show that the results were caused by negligence, the doctrine of *res ipsa loquitur* not being applicable, and nonsuit was properly entered.

BOBBITT, J., concurring.

APPEAL by plaintiff from *Crissman, J.*, 14 March, 1955 Term, FORSYTH Superior Court.

This is a civil action for damages alleged to have resulted from the negligent failure of the defendant (1) to use reasonable care and diligence in the application of his knowledge and skill as a physician and surgeon, and (2) to exercise his best judgment in attempting to remove a small piece of steel from plaintiff's body.

To the allegations of negligence the defendant entered a general denial. The substance of so much of plaintiff's evidence as bears on the question of law presented follows:

On 18 July, 1950, the plaintiff, an able-bodied man, was working in his auto repair shop near Kingsport, Tenn., when a small piece of steel, about $\frac{3}{8}''$ x $\frac{2}{8}''$ x $\frac{2}{8}''$, with sharp edges, broke off from the end of an automobile axle under a sledge hammer blow and penetrated plaintiff's body, entering the left front side of his neck just above his collar bone. He was examined by Dr. Howkins and later by Dr. Reed. There was bleeding from the entrance wound for about 15 or 20 minutes, but afterwards very little pain, no fever, and no apparent adverse effect from the accident. However, Dr. Reed had X-ray photographs made. He recommended that plaintiff consult the defendant, Dr. Bradshaw, and follow his advice as to an operation for removal of the missile.

On 31 July, 1950, plaintiff consulted Dr. Bradshaw, who had five X-ray pictures made of plaintiff's upper chest. The pictures were taken from the front, back and side. On one or two the foreign body showed indistinctly. When asked for his advice after the examination, Dr. Bradshaw stated that he thought the metal was going down, that it might get into his heart, and he strongly recommended it be removed. "I asked him about the operation, if it was a very serious one, and he said it wasn't nothing to it, it was very simple."

The defendant performed the operation on the morning of 2 August, 1950. Plaintiff testified: "When I woke up, I was trying to work my hand, and I couldn't use my fingers at all; I had never experienced that feeling before. At the present time (1955) I can't use my left hand at all. I can't use those fingers no way at all." To quote the plaintiff further: "I saw Dr. Bradshaw for just a short time after I woke up; that was the next morning. . . . I told him I couldn't clinch my fingers; that I couldn't use my hand. He said that that would get all right, said it would probably take three or four weeks. He stated they didn't get the piece of metal. . . . He said that he checked and there wouldn't be no danger in it; said everything would be all right." The plaintiff identified five X-ray photographs which Dr. Bradshaw told him he used in the operation. He said some others were made during the operation.

Dr. James Marr, admitted to be an expert in radiology and X-ray diagnosis, a witness for plaintiff, testified that he had examined the X-rays made on 1 August, 1950, on 6 August, 1950, and others made on 30 October, 1954; that in his opinion the steel fragment had moved very little, probably not over one-half inch. The metal object is about three-fourths inch from the lung and about four and one-half inches from the heart. "I have run across many cases of foreign objects lodged in the body . . . In most of those cases the foreign objects were left in the body. I would say it is sometimes difficult to find by operation, a foreign object of the size in question here."

"As to the internal structure of tissues lying between this missile and the heart would be just the muscles of the neck, then the covering of the lung, the lung itself, and the great vessels that supply the entire body coming from the heart. . . . They are about two and three-eighths inches from the piece of metal. The piece of metal may have changed slightly. It is in accord with general experience in the medical field with respect to foreign bodies of this kind and location that they sometimes do move. The depth of penetration of the metal is something that cannot be measured very exactly."

Question: "To what degree of exactness do any of the films dated 8-1-50 reveal the depth of the foreign object to be? (These are the photographs used by Dr. Bradshaw.)

Answer: "I can tell pretty well how far it is from the back surface of the body . . . and it is about three and one-half inches from the back surface of the body. From the front surface, as nearly as I can tell . . . and that is made difficult, of course, because the arms are up here (above the head) and they cast a shadow over this front, so that I can't tell exactly where the front surface of the neck is—that measures about three inches, or a little less."

"The whole area is one of the vital areas of the body. When a physician looks at an X-ray photograph, what he gets is an approximation. You do not see blood vessels, nerves or tendons, or muscles. I believe the brachial plexus lies back of and below where the foreign body is now. The brachial plexus is a cluster of very important nerves in the vicinity of this piece of metal . . . As I recall, there are six large nerves that comprise the brachial plexus and a number of smaller ones. The area involved here would be the area controlling the left arm, left hand and left side of the body. . . . I would say numerous times explorations and operations have been made to locate a foreign body without being able to locate and find it. The very best surgeons, in my experience, frequently are unable to locate and remove small foreign bodies in the body of a patient."

Dr. Everett O. Jeffreys, admitted to be a neurological specialist and surgeon, testified as a witness for the plaintiff: "I saw Mr. Hunt October 30, 1954. My findings at the time were that he had a claw hand on the left side. There were atrophies of the muscles. . . . I think this deformity to his arm was primarily the result of an ischemia (diminished or absence of blood supply) of a part of the brachial plexus, which can happen in exploring a brachial plexus. I don't have evidence to believe that the nerves had been cut in that they are not totally interrupted, and the impairment is a little bit too extensive for a clean cut or incision of the nerve. Therefore it seems to me that the . . . disability in the arm to the extent involved is an impaired blood supply

to a part of the brachial plexus, and this can happen to anybody who performs operations in the region of the brachial plexus."

"I think it is the usual practice to remove objects that lie in this region that have given evidence that they have penetrated tissues of vital function and I would consider it good practice in this territory, or any territory. I think the patient should always be informed that he might have some disability from the arm and some points, salient points, as near as the doctor can tell him about what to expect, be it bad or be it good; and I imagine that was done in Mr. Hunt's case."

In response to a question as to whether additional X-ray photographs would have been helpful in locating the steel missile, Dr. Jeffreys answered: "Foreign bodies are extremely difficult to locate at times. I would say that more X-ray views, giving all planes, as to location, its anteroposterior location or its lateral location, would aid in giving a clearer, more concise view as to where the metal rests; but it still might not locate it exactly." . . . "It has been my experience that it is sometimes difficult to locate and remove a foreign body from . . . a patient; I have had difficulty with it, with locating a piece of metal. . . . I have had difficulty in removing them. I have known instances wherein experienced, skilled and careful surgeons in this field have been unable to locate and remove foreign bodies. I think it is a fairly common experience among skilled surgeons in this field." . . . "When a foreign body, such as a piece of metal . . . gets into the body it migrates, particularly if it gets in the muscle sheaths, or in between layers of muscles. As the muscles contract and relax in their ordinary movement, that missile is propelled up or down or to one side."

In answer to a hypothetical question, Dr. Jeffreys answered that under the facts as set out in the question he would be inclined not to operate if the patient were free from symptoms—pain, temperature, etc.

At the conclusion of the plaintiff's evidence, the defendant's motion for judgment as of nonsuit was allowed, judgment entered accordingly, and the plaintiff excepted and appealed.

*Eugene H. Phillips for plaintiff, appellant.*
*Womble, Carlyle, Sandridge & Rice for defendant, appellee.*

HIGGINS, J. A physician or surgeon who undertakes to render professional services must meet these requirements: (1) He must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess; (2) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and (3) he must use his best judgment in the treatment and care of his patient. *Long v. Austin,* 153 N.C. 508, 69 S.E. 500; *Nash*

*v. Royster,* 189 N.C. 408, 127 S.E. 356; *Smith v. McClung,* 201 N.C. 648, 161 S.E. 91; *Wilson v. Hospital,* 232 N.C. 362, 61 S.E. 2d 102; *Jackson v. Sanitarium,* 234 N.C. 222, 67 S.E. 2d 57. If the physician or surgeon lives up to the foregoing requirements he is not civilly liable for the consequences. If he fails in any one particular, and such failure is the proximate cause of injury and damage, he is liable.

The plaintiff does not contend Dr. Bradshaw was deficient, either in learning or skill, or ability as a surgeon. He does contend, however, the defendant was not reasonably careful and diligent in making use of his knowledge, skill and ability, in advising the operation, and in performing it. In particular the plaintiff contends:

1. He was free from pain, fever or other symptoms and that an operation was not necessary.

2. The operation was undertaken without adequate X-ray pictures to enable the defendant to locate with sufficient certainty the piece of steel so that it could be directly approached and removed without extensive exploratory operation and search.

3. The defendant advised the plaintiff the operation was simple, whereas it was serious and involved undisclosed risks.

In determining whether the operation should have been undertaken, resort must be had to the evidence of experts. Expert opinion must be founded upon expert knowledge. The plaintiff offered the evidence of two specialists. Dr. Marr testified: "My field is X-ray examinations. I do not specialize in or practice surgery to any major extent . . . trying to remove this missile calls for very expert ability in the field of surgery." Dr. Marr expressed no opinion as to the advisability of the operation.

Dr. Jeffreys testified: "I think it is the usual practice to remove objects that lie in this region and have given evidence that they have penetrated tissues of vital function; and I would consider it within the realm of good surgical practice in this territory, or any other territory." The witness did state, in response to a hypothetical question that in the absence of symptoms he would be inclined not to operate. The plaintiff, therefore, is without expert testimony to support his contention the operation should not have been undertaken. The plaintiff's witness said the operation is in accord with good surgical practice.

The plaintiff insists the operation was undertaken without adequate X-ray photographs. He testified Dr. Bradshaw had available for use in the operation the five X-rays introduced in evidence and that at least one other was made during the course of the operation, the latter not in evidence. Dr. Jeffreys was asked a hypothetical question as to whether X-rays in addition to the five introduced in evidence would be in accordance with good surgical practice. Witness, after pointing out

the fact he did not have the photograph taken during the operation, said: "And these X-rays show the piece of metal in the base of the neck, that it is present; there is left, perhaps, the other view, which was not present in exhibits, that is mentioned in the question . . . which gives you another dimensional view . . . But that might have been desirable, but I can't say that it was necessary, . . . I would say that more X-ray views, giving all planes, as to location, its anteroposterior location . . . would aid in giving a more . . . concise view; but it still might not locate it exactly." When analyzed, nothing in this statement is to the effect that good surgical practice required additional X-rays.

The plaintiff's evidence is sufficient to support a finding the operation was of a very serious nature. Dr. Bradshaw, after examination, advised the plaintiff the missile might move and get to the heart, and recommended the operation. That a sharp-edged piece of steel does migrate is borne out by plaintiff's expert evidence, especially by Dr. Jeffreys. Upon Dr. Bradshaw's advice the operation was decided upon. It is understandable the surgeon wanted to reassure the patient so that he would not go to the operating room unduly apprehensive. Failure to explain the risks involved, therefore, may be considered a mistake on the part of the surgeon, but under the facts cannot be deemed such want of ordinary care as to import liability.

Proof of what is in accord with approved surgical procedure and what constitutes the standard of care required of the surgeon in performing an operation, like the advisability of the operation itself, are matters not within the knowledge of lay witnesses but must be established by the testimony of qualified experts. When the standards have been thus established, lay testimony may be sufficient to enable the jury to determine whether these standards were followed with ordinary care and diligence. *Smith v. Wharton*, 199 N.C. 246, 154 S.E. 12.

Plaintiff's expert testimony is sufficient to justify the finding the injury and damage to plaintiff's hand and arm resulted from the operation. But, as in cases of ordinary negligence, the fact that injury results is not proof the act which caused it was a negligent act. The doctrine *res ipsa loquitur* does not apply in cases of this character. *McLeod v. Hicks*, 203 N.C. 130, 164 S.E. 617. In the case of *Smith v. McClung*, *supra*, *Justice Brogden*, quoting from *Ewing v. Goode*, 78 Fcd. 442, said: "A physician is not a warrantor of cures. If the maxim '*res ipsa loquitur*' were applicable to a case like this, and a failure to cure were held to be evidence, however slight, of negligence on the part of the physician or surgeon causing the bad result, few would be courageous enough to practice the healing art, for they would have to assume financial liability for nearly all the 'ills that flesh is heir to.'"

Of course, it seems hard to the patient in apparent good health that he should be advised to undergo an operation, and upon regaining consciousness finds that he has lost the use of an arm for the remainder of his life. Infallibility in human beings is not attainable. The law recognizes, and we think properly so, that the surgeon's hand, with its skill and training, is, after all, a human hand, guided by a human brain in a procedure in which the margin between safety and danger sometimes measures little more than the thickness of a sheet of paper.

The plaintiff's case fails because of lack of expert testimony that the defendant failed, either to exercise due care in the operation, or to use his best judgment in advising it. As was said in *Smith v. Wharton*, *supra*, "There can be no other guide. And where want of skill and attention is not thus shown by expert evidence applied to the facts, there is no evidence of it proper to be submitted to the jury."

The judgment of nonsuit entered in the Superior Court is

Affirmed.

BOBBITT, J., concurring: Plaintiff's cause of action is grounded on the alleged negligence of the defendant. The allegations embrace two elements: (1) alleged negligence in advising the performance of the operation, and (2) alleged negligence in the performance thereof.

The court holds that the evidence fails to show that defendant's recommendation that plaintiff undergo the operation was made otherwise than in good faith and in the exercise of the sound judgment of a surgeon of great experience and recognized skill and also fails to show negligence in the performance of the operation. With these holdings I agree.

True, plaintiff alleges that when defendant recommended that the operation be performed, defendant *negligently* represented to him that the "operation was a simple one which entailed and involved no danger to the plaintiff's health and body" and that "but for said representations . . . the plaintiff would not have submitted to said operation." But plaintiff did not allege that said representations were false to the knowledge of the defendant or other facts that might nullify his consent to the operation. In short, plaintiff's action is not for assault and battery, or trespass to the person, predicated upon allegations of an unauthorized operation.

An unauthorized operation constitutes an assault and battery, *i.e.*, trespass to the person. As stated by *Judge Cordozo*, speaking for the Court of Appeals of New York: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages.

*Pratt v. Davis,* 224 Ill. 300, 79 N.E. 562, 7 L.R.A. (N.S.) 609, 8 Ann. Cas. 197; *Mohr v. Williams,* 95 Minn. 261, 104 N.W. 12, 1 L.R.A. (N.S.) 439, 111 Am. St. Rep. 462, 6 Ann. Cas. 303. This is true, except in cases of emergency where the patient is unconscious, and where it is necessary to operate before consent can be obtained." *Schloendorff v. New York Hospital,* 211 N.Y. 125, 105 N.E. 92, 52 L.R.A. (N.S.) 505, Ann. Cas. 1915C, 581. See also, *Bennan v. Parsonnet,* 83 N.J.L. 20, 83 Atl. 948; *Moos v. United States,* 118 F. Supp. 275. In *Mohr v. Williams, supra, Brown, J.,* quotes 1 Kinkead on Torts, sec. 375, viz.: "The patient must be the final arbiter as to whether he will take his chances with the operation, or take his chances of living without it. Such is the natural right of the individual, which the law recognizes as a legal one. Consent, therefore, of an individual, must be either expressly or impliedly given before a surgeon may have the right to operate." And there is authority to the effect that consent to perform an operation is not valid if induced by representations that are false to the knowledge of the surgeon who makes them. *Birnbaum v. Siegler,* 273 App. Div. 817, 76 N.Y.S. 2d 173; *Pratt v. Davis, supra; Wall v. Brim,* 138 F. 2d 478; *Nolan v. Kechijian,* 75 R.I. 165, 64 A. 2d 866; *Robinson v. Crotwell,* 175 Ala. 194, 57 So. 23; *Wall v. Brim,* 145 F. 2d 492.

Whether plaintiff's evidence would be sufficient for submission to the jury had he elected to bring his action on the ground of injury resulting from an unauthorized operation is not presented for decision on this record. Suffice it to say, plaintiff did not bring such action.

It seems appropriate to say that we have before us only the plaintiff's testimony as to the alleged representations. Judgment of involuntary nonsuit having been entered at the close of the plaintiff's evidence, the defendant was not heard as to his version of what occurred.