Edgar Fenton, Oklahoma City, Okl. (Elliott C. Fenton, Oklahoma City, Okl., on the brief), for appellant.

**Charles S. HUNT, Appellant,**

v.

**Howard H. BRADSHAW, Appellee.**

No. 7518.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 19, 1957.

Decided Jan. 6, 1958.

Eugene H. Phillips, Winston-Salem, N. C., for appellant.

Irving E. Carlyle, Winston-Salem, N. C. (Womble, Carlyle, Sandridge & Rice, Winston-Salem, N. C., on brief), for appellee.

Before PARKER, Chief Judge, SOBELOFF, Circuit Judge, and R. DORSEY WATKINS, District Judge.

SOBELOFF, Circuit Judge.

A malpractice suit against a surgeon ran its course in the courts of North Carolina, including the Supreme Court of that State, where the Superior Court's judgment of nonsuit against the plaintiff was affirmed. Thereafter, suit was begun anew in the United States District Court for the Middle District of North Carolina, jurisdiction resting on diversity. At the conclusion of the plaintiff's case, the District Judge directed a verdict for the defendant, and one of the questions on this appeal is the effect of the earlier proceedings upon the present litigation.

The plaintiff, Charles S. Hunt, a resident of Kingsport, Tennessee, operated a garage and service station in that city. On July 18, 1950, while he was holding a steel automobile axle as it was being struck with a sledge hammer by his helper, a small sliver of steel flew off and penetrated the base of the plaintiff's neck on the left side, near the upper portion of his chest. The missile was triangular in shape, and its dimensions were estimated to be $\frac{3}{8}'' \times \frac{3}{8}'' \times \frac{3}{8}''$. The plaintiff felt a sting as the metal entered his body, and there was bleeding from the wound for ten or fifteen minutes. He went promptly to the Kingsport Hospital, where Dr. Howkins made an X-ray examination and referred him to Dr. J. S. Reed, a surgeon of Kingsport.

Except for the brief period of bleeding and the initial sting of pain, the plaintiff suffered no symptoms. After seeing the patient several times, Dr. Reed told him that sometimes there is danger of a foreign object moving to a vital spot in the body. Accordingly, he advised the plaintiff to consult the defendant, Dr. Howard H. Bradshaw, a specialist in thoracic surgery, to ascertain whether it was necessary to remove the piece of steel. The plaintiff visited the defendant, who resides and practices his profession in Winston-Salem, North Carolina. After a stay of several days in the North Carolina Baptist Hospital in that city, during which interval four or five additional X-ray pictures were taken, Dr. Bradshaw, on August 2, 1950, operated in an effort to remove the piece of metal. He was, however, unable to locate it, and it was not removed.

When the plaintiff awoke from the anesthetic, his arm was numb and his hand useless. The doctor told him that he would be all right in time; also, that he had checked, and there was no danger of the piece of metal moving and causing injury. The plaintiff has suffered a sensory and motor paralysis in his arm, and it remains crippled and useless. Because of a constriction of the fingers, the plaintiff has what is known as a "claw hand." These injuries are permanent and have forced him to give up his garage.

The action was predicated upon several theories of malpractice variously alleged, which may be paraphrased and summarized briefly as follows: (1) That the operation was unnecessary, since there was no danger of the foreign object migrating to a vital spot, and that the doctor should not have advised or performed an operation, particularly in view of the fact that the plaintiff was suffering no

symptoms; (2) that the surgeon misrepresented to the plaintiff that the operation was a simple one and involved no danger, and (3) that the defendant was negligent in failing to make a reasonable effort to inform himself of the precise location of the metal object, undertaking a deeper exploration than was actually necessary; that this brought him into contact with the brachial plexus, a nerve center behind the clavicle, or collarbone, at the base of the neck, with disastrous results to the plaintiff; that if the defendant had taken into account what was shown by the X-rays made in Kingsport, Tennessee, which were made available to him by the plaintiff on his first visit to the defendant, or if additional lateral X-rays had been ordered by the defendant, it would have been manifest to him that such extensive exploration was unnecessary.

In the Superior Court of North Carolina, the plaintiff produced, in addition to his own testimony and that of other lay witnesses, two medical practitioners. One was Dr. James Marr, a radiologist, the other, Dr. Everett O. Jeffreys, a specialist in neurosurgery. The plaintiff relied upon testimony as to the circumstances of the operation, but did not elicit from his medical witnesses expert testimony to establish the breach of professional standards of care required of a surgeon in preparing for or performing an operation of the character here undertaken. On the defendant's motion, at the close of the plaintiff's case, the trial judge ordered judgment of nonsuit against the plaintiff.

On appeal, the Supreme Court of North Carolina affirmed the Superior Court. Hunt v. Bradshaw, 1955, 242 N.C. 517, 88 S.E.2d 762.

As to the defendant's alleged statements to the plaintiff that the operation was simple and not dangerous, the Court held that these were understandable reassurances to ease the mind of a patient about to undergo surgery, and not actionable.

With respect to the other theories of liability, the Supreme Court upheld the trial court's ruling, because there was a lack of expert testimony that the defendant failed either to exercise due care in the operation, or to use his best judgment in advising it.

Availing himself of the North Carolina statute,[1] the plaintiff within a year brought a new suit, this time in the United States District Court.

The District Judge rejected a preliminary motion of the defendant to dismiss the case on the ground of res judicata, and ordered trial on the merits. Hunt v. Bradshaw, D.C.M.D.N.C.1956, 145 F. Supp. 322. At this trial the plaintiff did not call Dr. Marr, but Dr. E. T. Walker, another radiologist, who lives in Greensboro, North Carolina.

Dr. Jeffreys, the neurosurgeon, was again a witness for the plaintiff. This time, however, the plaintiff, mindful of the ruling made by the Supreme Court of North Carolina in the first case, that expert testimony was required to establish violation of the standard of care due by the defendant, asked Dr. Jeffreys a number of hypothetical questions.

The record is a long one. Each side embarked upon different and not altogether consistent theories, some of which were not pursued to conclusion; but after careful examination of the entire transcript, we are convinced that there was significant testimony in the District Court sufficient to overcome the deficien-

---

1. —*General Statutes of North Carolina* (1953), Sec. 1–25:

"If an action is commenced within the time prescribed therefor, and the plaintiff is nonsuited, or a judgment therein reversed on appeal, or is arrested, the plaintiff or, if he dies and the cause of action survives, his heir or representative may commence a new action within one year after such nonsuit, reversal, or arrest of judgment, if the costs in the original action have been paid by the plaintiff before the commencement of the new suit, unless the original suit was brought in forma pauperis."

cy pointed out by the Supreme Court in reviewing the first trial. Thus, we think, there was an issue for the jury.

Dr. Walker is a licensed physician who for a time practiced general medicine in North Carolina and elsewhere. Thereafter, he took postgraduate courses to equip himself in radiology, and in this specialty he was engaged for nine years prior to the trial. He admitted that he had never done chest surgery and that in his general practice he had performed only minor surgery. As a radiologist, however, he said that he came in contact with various types of surgeons in a consulting capacity, and he claimed to be acquainted with the general approved practices among physicians and surgeons in North Carolina. The record shows the opinion testimony he was prepared to give, and he was permitted to state his answers upon this aspect of the case out of the jury's presence.

The judge, after full inquiry into Dr. Walker's education and experience, and with the opportunity and obvious disposition fairly to appraise the witness' competency, permitted him to testify in respect to radiological matters. He allowed him to explain the uses of X-rays, what they reveal, how they are employed by surgeons in determining the existence and location of foreign objects in the human body, and the correct interpretation of the X-rays made of Mr. Hunt. The Judge did not, however, permit the witness to express opinions to the jury as to what constitutes proper surgical procedure in preparing for or performing chest operations.

If admitted in evidence, it is unquestionable that Dr. Walker's opinions would be sufficient to establish the standards of good surgical practice and to make out a prima facie case of their violation.

The plaintiff complains that the exclusion of this testimony was error, and places strong reliance upon the case of Pridgen v. Gibson, 1927, 194 N.C. 289, 139 S.E. 443, 54 A.L.R. 855. We are not persuaded, however, that this case furnishes any support for the plaintiff's contention. The Pridgen case dealt with a physician who in his general practice had had experience in the removal of foreign objects from the eye. The Supreme Court of North Carolina held that, by the mere circumstance that he was not a specialist in that field, the physician was not disqualified as a matter of law from expressing an expert opinion upon the proper procedures in such a case. The Court was careful, nevertheless, to add, "If the ruling had been put upon the broad ground that his professional knowledge and training were not such as to satisfy the court of his competency to testify as an expert witness, it is not improbable, in the absence of abuse or palpable error, that a case of 'irreviewable discretion' would have been presented. * * *" Id., 139 S.E. 446.

The contrast between the two cases is plain. In Pridgen, the Judge, misconceiving the law, adopted an arbitrary rule and failed to exercise a judicial discretion; here, the Judge acted within the limits of his allowable discretion. He did not disqualify Dr. Walker as a matter of law because he was not a specialist in surgery but, after weighing the witness' professional background and qualifications, reached the conclusion that he had not shown such familiarity with the subject upon which he was being interrogated as to entitle him to express the opinion called for. Reading the testimony in all its detail, we cannot say that the District Judge acted unreasonably in restricting the scope of Dr. Walker's testimony to radiological matters. The general rule, adhered to by the Supreme Court of North Carolina and this court as well, is that the qualification of a witness to express an expert opinion should be left to the sound discretion of the trial judge. State v. Combs, 1931, 200 N.C. 671, 158 S.E. 252; In Re Humphrey, 1952, 236 N.C. 142, 71 S.E.2d 915; United States v. 25.406 Acres of Land, etc., 4 Cir., 1949, 172 F.2d 990. Cf. Gilbert v. Gulf Oil Corporation, 4 Cir., 1949, 175 F.2d 705; Hidden v. Mutual Life Insurance Co. of New York, 4

108

Cir., 1954, 217 F.2d 818. See, 2 Wigmore, Evidence (1940), Sec. 561, p. 641.

Dr. Walker was, however, properly permitted to interpret the X-rays taken in Tennessee by Dr. Howkins immediately after the accident, and also the X-rays taken at the direction of the defendant before the operation, as well as those taken by the witness. According to him, the metallic object was lodged on or just barely within the sternocleido-mastoid muscle at a depth in the plaintiff's body of one-half to three-quarters of an inch, and the plaintiff's brachial plexus was approximately two to two and one-half inches behind the piece of metal. He testified explicitly that even apart from the X-rays taken by Dr. Howkins from the plaintiff's left side, Dr. Bradshaw's own X-rays indicate that the foreign body was in a relatively harmless position.

A hypothetical question based upon this testimony of Dr. Walker was then put to the neurosurgeon, Dr. Jeffreys, whose competency to express an opinion was not challenged. Upon the assumed facts of this question, Dr. Jeffreys was asked whether one operating for the removal of the foreign object would in the exercise of the ordinary care and skill of a surgeon conduct his search for the object without contacting the brachial plexus. He replied that, " * * * it would not be indicated to go two and one-half inches or do further deeper exploration in order to find the object if you had it definitely localized by X-ray."

Dr. Jeffreys also gave it as his opinion, based on the hypothesis of other testimony in the case, that the plaintiff's disability was due to an ischemia (a diminution of the blood supply) of the brachial plexus, caused in the course of the operation, "in searching for the object * * * and in dissecting and handling the brachial plexus." He ruled out, upon the basis of the patient's history, the likelihood that the ischemia was caused by the metal object itself as it entered the body. " * * * I would believe in the time that elapsed, if it were due to the metal object itself, that he would have had

some loss and disability prior to the operation."

This testimony, it is true, is interlarded with many other hypotheses as to the relative locations of the piece of metal and the brachial plexus, upon which Dr. Jeffreys expressed other opinions; but we are not concerned with these now. On a motion for a directed verdict, the Court must view the evidence, and all reasonable inferences deducible therefrom, in the light most favorable to the plaintiff and determine whether the evidence makes out a case entitling him to relief. It does not matter if there is conflicting testimony from which opposing inferences may be drawn. When the testimony comes to be weighed by the jury, the favorable inferences may be offset by the contrary inferences, and the effect of all that the plaintiff has shown may be overcome by the other evidence; but at the close of the plaintiff's case, he is entitled to the benefit of this well established rule as to directed verdicts. Whether a case of this character is tried in a federal or state court, liability is determined according to applicable state law; but when there is a debatable issue of fact in the trial of a suit at common law in a court of the United States, the right to have it determined by a jury is guaranteed by the Seventh Amendment of the Constitution. Burcham v. J. P. Stevens Co., 4 Cir., 1954, 209 F.2d 35; Nicholson v. Stroup, 4 Cir., 1957, 249 F.2d 874.

The jury could, of course, accept the radiological findings of Dr. Walker and the history testified to by others, and apply to the facts so established to the jury's satisfaction the standard of surgical practice laid down for such cases by Dr. Jeffreys. A physician or surgeon is not a guarantor of success. He is not liable for an untoward result not forseeable and not resulting from a lack of due care; the law does not hold him to a standard of infallibility. Nash v. Royster, 1925, 189 N.C. 408, 127 S.E. 356. The surgeon is, however, required to " * * * exercise reasonable care and diligence in the application

of his knowledge and skill to the patient's case; and * * * he must use his best judgment in the treatment and care of his patient." Hunt v. Bradshaw, 1955, 242 N.C. 517, 88 S.E.2d 762, 765.

The defendant insists that there was no substantial difference between the evidence in the two trials. With this we do not agree; there are crucial differences. In the first trial, the testimony of Dr. Jeffreys which has been pointed out above, was not present. In fact, the absence of such testimony was noted by the Supreme Court of North Carolina and was a ground for its decision.

The defendant also contends that even if there was new evidence in the District Court, it was available to the plaintiff at the first trial and he would therefore be bound by the record and result of that trial. We find this contention likewise insubstantial. It was repudiated in Kelly v. Kelly, 1954, 241 N.C. 146, 84 S.E.2d 809, 812, where the right to maintain a second action after nonsuit in the first was held not affected by the fact that documentary evidence relied on was available but not introduced at the first trial. The Court distinguished the situation from one in which final judgment has been entered.

The very purpose of the North Carolina statute is to afford a second opportunity to a plaintiff if he has been nonsuited because of a deficiency in the evidence. If the case had been permitted to go to final judgment, the plaintiff could not begin a new suit and seek to maintain it by producing additional testimony, but when the defendant offers a motion for nonsuit at the end of the plaintiff's case, and prevails, his victory may prove not to be permanent, for by statute it has the inherent limitation that the plaintiff may within a year make another effort and meet with greater success by supplying the deficiency. If the nonsuited plaintiff brings a new action within the statutory time, it is tried *de novo*. Of course, if the evidence in the second trial is not substantially different from that in the first, then under the law of North Carolina the same result must follow as in the first case. Hampton v. Rex Spinning Co., 1930, 198 N.C. 235, 151 S.E. 266; Chapman v. Great Atlantic & Pacific Tea Co., 1936, 210 N. C. 842, 188 S.E. 628; Ingle v. Cassady, 1937, 211 N.C. 287, 189 S.E. 776; Smith v. McDowell Furniture Co., 1950, 232 N.C. 412, 61 S.E.2d 96.

But where, as here, the evidence in the second trial is substantially different, and establishes a cause of action, the plaintiff is entitled to have the case submitted to the jury. Hood v. Western Union Telegraph Co., 1904, 135 N.C. 622, 47 S.E. 607; Midkiff v. Palmetto Fire Ins. Co., 1930, 198 N.C. 568, 152 S.E. 792; Swainey v. Great Atlantic & Pacific Tea Co., 1933, 204 N.C. 713, 169 S.E. 618; Smith v. Pilot Life Ins. Co., 1933, 216 N.C. 152, 4 S.E.2d 321.

Reversed and remanded.