William **MITCHELL**, Respondent,

v.

**G. Wilse ROBINSON, Jr.**, Paul Hines, Louise Loewy, Jack D. DeMott, Olive B. Robinson, Erna M. Robinson, Lucille DeMott, Paul E. Robinson, Doing Business as Robinson and Robinson, a Partnership, Appellants.

No. 47460.

Supreme Court of Missouri,

Division No. 2.

April 11, 1960.

———◆———

Henry W. Buck, John R. Gibson, Morrison, Hecker, Buck & Cozad, Kansas City, for appellants.

A. C. Popham, Kansas City, for respondent. Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel.

BARRETT, Commissioner.

William Mitchell has been awarded $15,000 damages against the Doctors Robinson and their associates, particularly Dr. Jack DeMott, for malpractice, and the essentially meritorious problem is whether upon the record there is any evidence to support the jury's finding of negligence.

Mitchell and Dr. DeMott were boyhood schoolmates in Independence, Kansas, attended Kansas University at the same time, and were both living in Independence when Dr. DeMott began the practice of medicine there. So when in 1951, at age 35, Mitchell was beset with serious emotional problems he sought out Dr. DeMott who was then a specialist in neurology and psychiatry and was then associated with the Doctors Robinson and the Neurological Hospital in Kansas City, Missouri. Mitchell had

"a rather severe emotional illness," process schizophrenia, but he was not mentally incompetent; his illness was characterized by serious depression and rather severe anxiety, complicated by alcoholism. It is not necessary at this point to detail his case history and symptoms; it was the opinion of the doctors that he should have "combined electro-shock and insulin sub-coma therapy." The general purpose of electroshock treatment is to build up the patient's "defenses and controls and self-confidence" while insulin relieves "basic anxiety" and "disturbance of the mood." The desired physical reaction and intended purpose of electroshock is to induce convulsive seizures of forty to fifty seconds duration. The desired physical reaction of insulin shock is the induction of unconsciousness, a "subcoma" state, but it is neither intended nor desired, as it is with electroshock, that the patient suffer a convulsion. One of the unpredictable results of insulin shock, however, is an unpreventable convulsion and one of the hazards of convulsions, whether from insulin or electroshock, is fractured vertebrae, fractured legs and various other injuries.

On October 25, 1951, Mitchell had his first electroshock treatment, the next day another, and, after two days' rest, his first insulin shock October 28 and the next day another, and on the 30th his third electroshock and on the 31st another insulin treatment. There were convulsions with the electroshock treatments but no untoward results; the insulin treatments came off with normal results and reactions except that on the 31st Mitchell suffered a convulsion and that particular treatment was successfully terminated by an intravenous injection of glucose. Insulin treatment, reduced to 25 units, was resumed November 2, but Mitchell went out for a walk and came in drunk and the treatments were "started over" again on November 4 with 25 units, increased to 40 units November 5 and on November 7, with his seventh insulin treatment of 40 units, he had "a hard generalized con-

vulsion," a grand mal seizure, which resulted in a compression fracture of the fifth, sixth and seventh dorsal vertebrae. It is to recover damages for these specific injuries that Mitchell instituted this action.

These briefly noted facts are excerpted as background for certain basic distinctions in this and other malpractice cases and eventually to point up the problem precisely involved upon this appeal. The appellant doctors, relying on the general rules (Williams v. Chamberlain, Mo., 316 S.W.2d 505), contend that their motions for a directed verdict should have been sustained because "There was no expert testimony to show that the insulin therapy administered to Mitchell failed to conform to the required standards of an ordinarily careful and prudent neurologist or psychiatrist in the community," indeed, the greater part of their brief is devoted to this subject. This phase of the appellants' argument has but little, if any, bearing upon the basic problem involved here; it may be that they could not anticipate just what position the plaintiff would take. But the plaintiff has made it perfectly clear that there is no claim of negligence in any of these general respects; in his brief he repeatedly disclaims any such reliance: "Under point I(a) appellants say there was no expert testimony to show that the insulin therapy administered to Mitchell failed to conform to the required standards. *That is not the complaint.* * * * Plaintiff does not question the technique of administering the insulin, nor does he deny that it should have been administered. * * * There (Steele v. Woods, (Mo.) 327 S.W.2d 187), as here, there was no complaint that the operation was not recommended by good medical practice and was not competently done." Furthermore, there is no question here as to the plaintiff's consent to the treatment (annotation 139 A.L.R. 1370) or claim that the procedure extended beyond that contemplated by the consent. Annotation 56 A.L.R.2d 695. Again the plaintiff disclaims: "Indeed, he consented to that. * * * Mitchell had already given his oral consent."

On the other hand, despite the repeated disclaimers, the plaintiff immediately argues, inconsistently, that "The issue on the second ground of negligence is whether defendants owed plaintiff a duty to use ordinary care to prevent injury to him during the insulin treatment. On this issue, as well, the defendants provided the necessary expert evidence." At another point the plaintiff says: "But he also proved the defendants were negligent *after* it had been administered in that they failed to use ordinary care to prevent the convulsion by giving him an injection of glucose, when they had ample opportunity to give him the injection. He proved they were negligent in failing to prevent injury from the convulsion after it had begun by guarding him with proper restraints— ankle and wrist cuffs, and a complete body covering as described by Dr. Pool." Upon this phase of the argument the fact was that when the insulin was administered to Mitchell, and all other patients receiving the treatment, he was placed on his back upon a hospital bed with a heavy leather "waist belt" or restraint around the middle of his body. And on this particular occasion, as on other occasions, five attendants were present at the bedside, two colored maids, a male attendant, a nurse and Mrs. Wuebbold, the experienced (more than twenty years) supervisor of insulin therapy,—it was she who administered the insulin. The defendants produced as a witness Dr. Pool, a radiologist connected with a veterans' hospital, Fort Roots Hospital, North Little Rock, Arkansas. While he was neither a neurologist nor a psychiatrist and disclaimed any special qualification in these fields he had made two case studies of the incidence of fractures from shock therapy as they occurred in his hospital. In one study of 46 insulin shock patients he testified that eighteen per cent of them sustained fractures, that in the course of combined electro and insulin shock treatment of 53 patients nineteen per

cent sustained fractures, and in another group of 32 patients twenty-five per cent sustained fractures. In his cross-examination Dr. Pool said that in Fort Roots Hospital patients receiving shock treatment were placed in a heavy canvas shroud covering their bodies from head to foot. Another of the defendants' witnesses, Dr. Bills, a neuropsychiatrist, said that wrist and ankle cuffs were sometimes employed. Mrs. Wuebbold, Dr. Bills and others, said that when the first signs of a convulsive seizure appeared, a twitching about the eyes and mouth, glucose was administered to restore consciousness, terminate the treatment and thus prevent a convulsive seizure. These and other circumstances are pointed to, the fact that Mrs. Wuebbold stood at his bedside and saw the face twitching but did not administer glucose, and it is argued that the jury could reasonably draw the inference that the defendants failed to use ordinary care to prevent injury during the treatment in that they could and should have employed all or some of these measures or expedients and thus have prevented the convulsive fractures.

Aside from the disclaimers and the inconsistency of the plaintiff's argument, the insuperable difficulty with this theory of liability is that he did not offer any expert medical testimony upon any of these subjects and the testimony pointed to does not support the inference of negligence in failing to prevent injury during treatment or in failing to employ other restraints or in failing to administer glucose. While the defendants' witnesses testified that wrist and ankle cuffs or other restraints were sometimes employed or glucose used (as it was successfully on Mitchell's sixth insulin treatment), without exception they all testified that the procedures, measures, restraints and treatment employed on the occasion of his seventh insulin treatment were all in accordance with recognized medical practice in such cases in Kansas City and no other inference is fairly permissible from this testimony.

These are not matters of common knowledge or within the experience of laymen and expert testimony is necessary to establish negligence in these respects (Williams v. Chamberlain, supra; Steele v. Woods, supra) and proof that some other measure was possible or that elsewhere some other type of restraint was in use does not support the inference of negligence or here supply the deficiencies in the plaintiff's proof. Spain v. Burch, 169 Mo. App. 94, 154 S.W. 172; Farber v. Olkon, 40 Cal.2d 503, 254 P.2d 520; Regan, Doctor and Patient and the Law, Sec. 38, p. 284. In short and to clarify the meritorious problem involved here, there was no substantial evidence of negligence in these particular respects as the plaintiff partially and conjunctively submitted in instruction one.

One further preliminary matter should be noted; in most of the cases involving fractures from shock therapy the determinate problem has been whether res ipsa loquitur was applicable and almost without exception it has been held that the doctrine was not applicable, and, as the doctors urge, proof alone of an unintended convulsion and fractures does not establish negligence. Farber v. Olkon, supra; Johnston v. Rodis, 102 U.S.App.D.C. 209, 251 F.2d 917; Quinley v. Cocke, 183 Tenn. 428, 192 S.W.2d 992. But compare "The California Malpractice Controversy," 9 Stanford L.R. 731, and Salgo v. Leland Stanford Jr., Univ. Bd. of Trustees, 154 Cal.App.2d 560, 317 P.2d 170, in which res ipsa loquitur was held to be applicable to paralysis resulting from or as a complication of an aortography. It is not claimed that res ipsa loquitur has any part in this case but contrary to the doctors' contention, even though there is but a plea of "general negligence," the plaintiff is entitled to hypothesize any submissible act of negligence supported by his evidence, particularly any negligent fact issue tacitly tried by the parties as was the case here. V.A.M.S. § 509.500; Hales v. Raines, 162 Mo.App. 46, 141 S.W. 917.

This finally brings us to the really meritorious question of whether in the circumstances of this case, the illness and treatment involved, the doctors were under a duty to inform the plaintiff that one of the hazards of insulin treatment is the fracture of bones not involved in either the illness or the treatment. That the hazard exists is beyond question; Dr. G. Wilse Robinson, Jr., said that fractured bones, serious paralysis of limbs, irreversible coma and even death were hazards incident to shock therapy and further that there are no completely reliable or successful precautions. In their amended answer the defendants "state that the fracture of bones is a danger and risk that is inherent in insulin shock therapy, and that compression fractures of the spine, and fractures of the limbs can and frequently do occur when said insulin shock therapy is properly administered." The plaintiff's principal claim here is that "There was evidence of a negligent failure to disclose to plaintiff the hazards of insulin treatment," and, of course, evidence that plaintiff would not have consented to the treatment had he known of the dangers. In his argument plaintiff states his position in this language: "He relies on defendants' negligent failure to warn him of the danger of injury from this therapy and on defendants' negligent assurance that there was no danger, and failure to use due care as submitted to the jury." The appellants, on the other hand, do not attempt to demonstrate or elaborate, they simply say that "Failure to inform Mitchell of the risks of the treatment, if there was such a failure, is not negligence." Thus, the serious hazards being admitted, the problem is whether in the circumstances of this record the doctors were under a duty to inform their patient of the hazards of the treatment, leaving to the patient the option of living with his illness or of taking the treatment and accepting its hazards. Mohr v. Williams, 95 Minn. 261, 268, 104 N.W. 12, 14, 1 L.R.A.,N.S., 439.

To begin with it must be said that very little thoughtful consideration has been given this specific problem, particularly with respect to electroshock and insulin therapy. According to Dr. Robinson the shock treatments for emotional disturbance and mental illness came into use in this area about 1940 and with the advent of the so-called tranquilizer type drugs electroshock and insulin therapy are not employed as often as they were a few years ago. Kansas solved the problem, at least as to its public institutions, by passing a statute which provides that "No person" suffering physical or mental injuries from shock treatment "shall * * * have a cause of action for damages against any physician or technician" unless the injury or death resulted from "gross negligence." G.S.Kan.1959 Supp. 76–1239 and see 2 Kan. L.R. 393. Here the doctors rely on but two cases in support of their statement that failure to warn of the hazards is not negligence, Steele v. Woods, supra, recently decided by this court, and Hunt v. Bradshaw, 242 N.C. 517, 88 S.E.2d 762, 763. These cases involved a dangerous operation and a most needful postoperative treatment, neither case was concerned with shock treatment or in fact with failure to warn of the hazards of any dangerous medical procedure. In the North Carolina case it was alleged that the paralysis of the plaintiff's arms and legs resulted from the doctor's negligence in attempting to remove a piece of steel lodged in the vicinity of the plaintiff's brachial plexus. The essentials of the case turned on the general rules and the failure of the plaintiff to adduce expert medical testimony in support of his charges of negligent care in operating and negligence in advising the operation. However, the plaintiff said, "I asked him about the operation, if it was a very serious one, and he said it wasn't nothing to it, it was very simple." The court noted that the plaintiff's evidence was sufficient to support a finding that the operation was of a very serious nature, but in connection with the plaintiff's statement and whether the operation was advisable the court said: "It is understandable the surgeon wanted to reassure the

patient so that he would not go to the operating room unduly apprehensive. *Failure to explain the risks involved, therefore, may be considered a mistake on the part of the surgeon, but under the facts cannot be deemed such want of ordinary care as to import liability."*

Aside from the fact that the case did not hinge on or involve failure to warn of hazards connected with the operation, the court's italicized statement is inapplicable to this case because the hazards were not withheld from Mitchell because of the doctors' desire to protect him or to reassure him or because they did not want him to enter upon the treatment apprehensive of the results. Dr. DeMott and Dr. Robinson insist that they did warn Mitchell of the dangers and risks of the treatment in great detail, including the possibilities of fractures from either intended or unintended convulsive seizures. Upon this precise point the burden of the doctors' argument is that "Mitchell's contrary testimony is not substantial and competent to sustain his verdict in view of Dr. DeMott's testimony that in the mental and emotional state that Mitchell was in at the time of the conferences, he could not possibly have an accurate memory of the conferences after the passage of a number of years." And while on this subject it is just as well to note that Mitchell testified that he did indeed remember the conferences and he said that Drs. Robinson and DeMott recommended the electroshock and insulin therapies, that he personally had no knowledge of the possibilities of fractures from insulin, that they explained the "process" to him "but there was nothing in his conversation to me that indicated any risk or disability as a result of the insulin treatment or any risk of disability at all." He categorically denied that either of the doctors advised him of the possibility of bone injuries or death from the treatments. He said that he asked Dr. DeMott if there was any danger and "His answer was that the treatments had only a temporary effect, a confusion that would last only a matter of an hour or so. He didn't say there would be any lasting effect at all"—in fact the doctor replied, "no danger."

Following a varicose vein operation a paravertebral block is a necessary procedure to prevent impairment of circulation, gangrene and sometimes loss of extremities. In Steele v. Woods, supra, the other case relied on by the appellants, plaintiff submitted her case upon the theory that the doctor failed to advise her of the necessity of such a procedure. When Mrs. Steele entered the hospital for a second operation, the varicose vein operation, her husband signed a consent form but for some unexplained reason she did not sign a written consent. The doctor did not inform the husband of the necessity for a paravertebral block, he claimed however that he advised Mrs. Steele of the necessity for the procedure but she refused to have the nerve block and thereby contributed to her consequent disabilities. One of the doctor's expert witnesses testified that it was the duty of a doctor to inform the patient or some member of her family of the necessity for the treatment. The court held that as a part of the applicable general rules, it was the duty of the doctor to prescribe the treatment and that whether it was offered and refused was a question of fact for the jury to resolve. In concluding that the plaintiff made a submissible case the court said: "And we think expert testimony is not required in order to establish whether or not a doctor has complied with his duty to communicate the advice of a treatment, admittedly necessary, under a given state of facts." [327 S.W.2d 199.] So in this case, the plaintiff explicitly denying and the doctors affirming that they advised the plaintiff of the hazards of shock therapy, a fact issue was presented upon which there was no necessity for expert medical testimony. This case, Steele v. Woods, does not explicitly hold that it is the duty of a doctor to warn his patient of the hazards of a proposed treatment but there is a lesson in the case and its plain implica-

tions are certainly no comfort to the doctors here.

Mitchell did not sign a written consent to the treatment; however, in his brief he repeatedly states that he needed the treatment and "Indeed, he consented to that," but, he says, he would not have consented had he been informed of the hazards. His then wife (they were divorced in 1952 and both have remarried) did sign a consent which contained this sentence: "This is to certify that I have been informed of the possible dangers of the shock treatment with curare and electro-shock, or ~~metrazol~~, or with insulin in the case of William Mitchell and that I hereby give permission to the Neurological Hospital and staff to administer this treatment and request that this be done. We assume responsibility for any complications or accident resulting from the administration of these treaments." Mitchell testified that he did not authorize his wife to sign the consent and that he never heard of it until long after he had been discharged from the hospital and therefore had no notice from the consent of the hazards of the treatment. It is not necessary to say whether the consent Mitchell's wife signed was a valid assumption of the hazards of the treatment, the problem is whether it warned of the dangers and according to him he never heard of it and here, as in the Steele case, the doctors contend that they personally gave him the warning. See Rothe v. Hull, 352 Mo. 926, 935, 180 S.W.2d 7, 12. The consent signed by the wife and the doctors' claim of a personal warning is some recognition by them of an obligation or duty to warn.

As indicated, these two cases relied on by the appellants were not concerned with shock therapy and they do not plainly consider the basic problem of whether the doctors were under a duty to warn their patients of the hazards of the particular procedure or treatment involved in those cases. And, it may be added, a case fairly meeting and considering the problem in connection with shock therapy or in comparable circumstances has not been found.

In the rather bizarre case of Lester v. Aetna Casualty & Surety Co., 5 Cir., 240 F.2d 676, the doctors deemed it unwise and unsafe to advise the patient of the hazards of shock treatment and it was held that his wife's written consent did not deprive the husband of the right to contract without due process of law—the only question involved upon the appeal. In the Rodis cases, (Johnston v. Rodis, 102 U.S. App.D.C. 209, 251 F.2d 917, 918; Johnston v. Rodis, D.C., 151 F.Supp. 345) it was held that res ipsa loquitur was not applicable when the plaintiff sustained five or six fractures of her arm in electroshock treatment. However, the United States Court of Appeals in reversing the judgment said: "The statement attributed to the defendant, that shock treatments are 'perfectly safe', contains less of prediction and more of present fact. We think this statement, if the defendant made it and did not qualify it in any way, might properly be found to be a warranty." Salgo v. Leland Stanford Jr., Univ. Bd. of Trustees, 154 Cal.App.2d 560, 317 P.2d 170, 181, did not involve shock therapy, the principal question was whether res ipsa loquitur was applicable to paralysis resulting from an aortography. But the plaintiff, his wife and his son testified that they had not been informed than an aortography was to be performed and of course they had no knowledge of the dangers of this new and very hazardous procedure. The doctors, while admitting that the details of the procedure were not outlined and explained, contradicted the plaintiff's testimony. The trial court gave a rather broad instruction upon the duty of a physician "to disclose to the patient 'all the facts which mutually affect his rights and interests and of the surgical risk, hazard and danger, if any * * *.' " The instruction continued: "A physician violates his duty to his patient and subjects himself to liability if he withholds any facts which are necessary to form the basis of an intelligent consent by the patient to the proposed treatment. Likewise the physician may not minimize the known

dangers of a procedure or operation in order to induce his patient's consent. * * * One is to explain to the patient every risk attendant upon any surgical procedure or operation, no matter how remote; * * *." The implication of the case is that the doctor is under a duty to warn the patient of the hazards of the procedure, but in considering this instruction in connection with the hypothesis of res ipsa loquitur the court arrived at this rather ambiguous if not inconclusive result: "The instruction given should be modified to inform the jury that the physician has such discretion consistent, of course, with the full disclosure of facts necessary to an informed consent."

While the fairly relevant cases may be indicative but inconclusive the authoritative literature is more specific and helpful to a positive and rather confident conclusion. The subject of the thoughtful article, by a doctor-law teacher, in 41 Minn.L.R. 381, is "A Reappraisal Of Liability For Unauthorized Medical Treatment," but in considering Hunt v. Bradshaw, supra, and the leading cases of Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, 52 L.R.A.,N.S., 505 (Cardozo) and Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 1 L.R.A.,N.S., 439, all cited by the parties here, the author has this to say, loc. cit. 427: "If the sole basis or reason for bringing an action is the former, i. e., disappointment as to the outcome of the operation, there is no real loss in denying recovery. On the other hand, *serious objection may be raised to denying recovery where the reason for bringing the action is failure of communication by doctor to patient.* The proper solution of this problem, in the opinion of the author, is to recognize that *the doctor owes a duty to his patient to make reasonable disclosure*

*of all significant facts,* i. e., the nature of the infirmity (so far as reasonably possible), the nature of the operation *and some of the more probable consequences and difficulties inherent in the proposed operation. It may be said that a doctor who fails to perform this duty is guilty of malpractice."* [1] (Italics supplied.)

There is no problem here as to so doubtful a matter as the proper diagnosis of Mitchell's illness or as to the prognosis following treatment, matters which may be conclusions or which lie in the field of speculation, as contrasted with matters of fact, which the doctors could not intelligently communicate to their patient—another suggested qualification upon the imposition of liability. 41 Minn.L.R. 381, 429. The rather high incidence of unintended convulsions and resultant fractures in insulin treatment was a well-known fact, and the final result here was not a matter of supposition as it often is with diagnosis and there was no problem as to the success or failure of the procedure in so far as it related to the primary objective of the treatment. There is no complaint here of the success or result of the treatment, the treatment improved Mitchell's emotional illness (although he was again under the care of these same doctors in 1957 and 1958 before his case was tried in October 1958, the suit having been filed in 1952). The incidental hazard here of convulsive fractures was not a danger inseparable from the hazards attendant to many comparatively simple operations or techniques such as the danger of infection, tetanus, or of failure or death under anesthesia. Compare: Spain v. Burch, supra; Kenny v. Lockwood, (1931) 1 D.L.R. (Ontario) 507, and Williams v. Chamberlain, supra. There was no emergency here, it was not even claimed that Mitchell was critically

1. Other relevant and informative literature and cases considered, in addition to those mentioned in the opinion: 14 Rocky Mountain L.R. 233; 19 Tenn.L.R. 344, 349; 40 Minn.L.R. 876; annotation 56 A.L.R.2d 695; Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W. 2d 186; Wall v. Brim, 5 Cir., 138 F.2d 478; Hunter v. Burroughs, 123 Va. 113, 96 S.E. 360; 70 C.J.S. Physicians & Surgeons § 48m, p. 971.

or dangerously ill and that immediate spectacular treatment was imperative. He was "emotionally" ill and the treatment was "recommended," but it was not immediately necessary to save his life or even his sanity. The doctors said that he had "a rather severe emotional illness," he was "upset, agitated, anxious, depressed, crying." He had been drinking excessively, he was having marital difficulties, was not sleeping well, could not think things through, had unsuccessfully attempted to work for his father and later unsuccessfully attempted to work for his then father-in-law. As indicated, when Mitchell came to the doctors he was not mentally incompetent or in delirium, he had some understanding of his problems and the need for treatment.

■ In the particular circumstances of this record, considering the nature of Mitchell's illness and this rather new and radical procedure with its rather high incidence of serious and permanent injuries not connected with the illness, the doctors owed their patient in possession of his faculties the duty to inform him generally of the possible serious collateral hazards; and in the detailed circumstances there was a submissible fact issue of whether the doctors were negligent in failing to inform him of the dangers of shock therapy.

■ Even though there was a submissible case, solely upon the indicated hypothesis, it is not possible to affirm the judgment plaintiff has obtained. The principal instruction, instruction one, is indeed a very sketchy submission of his basic theory and right of recovery and that theory is submitted conjunctively with extraneous matter and another hypothesis upon which he was not entitled to recover as previously indicated, one that required expert medical testimony. It is not necessary to say, however, that instruction one, standing alone, demands the granting of a new trial.

At the behest of the defendants the court gave instruction 7, all of which was probably not justified, which in substance submitted whether the doctors did warn Mitchell and whether his injuries resulted "solely" from a danger inherent in insulin therapy. At the request of the plaintiff the court gave instruction 7a which the plaintiff says is a "proper counter or converse" of instruction 7. Instruction 7a begins by telling the jury that instruction 7 "is known as a sole cause instruction and submits the issue of sole cause of injury without any contributing negligence whatever on the part of defendants as submitted in instruction number one." The instruction, all in one sentence, then proceeds, "and if from the greater weight of all the credible evidence in the case you believe and find that negligence, if any, on the part of defendants toward plaintiff as submitted in said instruction number one caused or directly contributed to plaintiff being so injured, if so, then your finding under said instruction number 7, that is, upon the issue of sole cause submitted therein, must be in favor of plaintiff William Mitchell and against defendants." In the first place instruction 7, whatever its basic defects, is not a "sole cause" instruction, was not intended to be, was not made so by the mere use of the word "solely," and in the circumstances of this record and this case it is not believed that the doctrine of sole cause could have the slightest application. In the second place, instruction 7a is not a true "counter or converse" instruction, particularly of instruction 7, and it does, repeatedly and abstractly and therefore confusingly and erroneously inject into the case the false issue of "sole cause." Stupp v. Fred J. Swaine Mfg. Co., Mo., 229 S.W.2d 681. From all that appears from this instruction, either factually or by direction, the negligence referred to and to be found in instruction one was the conjunctively submitted hypothesis for which there was no evidentiary support and so the instruction may have been quite

misleading as well as confusing. For these indicated reasons the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

LEEDY, P. J., EAGER and STORCKMAN, JJ., and ELMO B. HUNTER, Special Judge, concur.