DR. CLARENCE N. STONE v. DR. RICHARD CULPEPPER PROCTOR.

(Filed 14 June 1963.)

**1. Physicians and Surgeons § 11—**

A physician is required to possess that degree of professional knowledge and skill which others similarly situated ordinarily possess, to exercise reasonable care and diligence in the application of his knowledge and skill for the patient's care and to use his best judgment in the treatment and care of the patient, and may be held liable by the patient for injury resulting from failure in any one of these respects.

**2. Physicians and Surgeons §.15; Evidence § 15—**

In an action against a psychiatrist to recover for injuries resulting from the repetition of electroshock treatment after the first such treatment had caused pain of which plaintiff had complaind and given notice to defendant, plaintiff is entitled to introduce in evidence the "Standards for Electroshock Treatment" prepared by the American Psychiatric Association, of which defendant was a Fellow, setting forth a standard of practice, with which defendant was familiar, to make X-ray examination if a patient complained of pain after electroshock treatment.

**3. Physicians and Surgeons § 17— Evidence that psychiatrist repeated shock treatments without examination after patient complained of pain held to take issue of negligence to jury.**

Evidence tending to show that plaintiff, after receiving an electroshock treatment administered by defendant or under his control, complained of pain in his back, that further shock treatments were administered without X-ray examination of plaintiff to ascertain if he had suffered accidental injury as the result of the first, that such X-ray examination was standard practice in such instance, and that shortly thereafter X-ray examination by another physician disclosed that plaintiff had suffered a compressed fracture of recent date of the ninth thoracic vertebra, *is held* sufficient to overrule nonsuit in an action for malpractice.

APPEAL by plaintiff from *Copeland, S.J.,* November 19, 1962, Civil Term, GUILFORD Superior Court (Greensboro Division).

The plaintiff instituted this civil action against the defendant, his physician, to recover damages for personal injury allegedly caused by the defendant's negligence in the course of administering electroshock therapy on five occasions during the course of treating the plaintiff for a mental disorder.

The plaintiff does not contend the defendant was in any way deficient in the special knowledge and skill required for the practice of psychiatry; nor does he contend the defendant was negligent in the administration of the first treatment. He does contend, however, that the first treatment produced a compression fracture of the ninth thoracic vertebra which the defendant negligently failed to discover

and continued further treatments, greatly aggravating the injury and increasing the damage.

The foregoing is a partial outline of the plaintiff's allegations. His evidence tended to show the physician-patient relationship of the parties. In the course of treatment the defendant had the plaintiff admitted to Graylyn Hospital in Winston-Salem. The defendant was Graylyn's Assistant Director and a member of its psychiatric staff. He prescribed and caused to be administered to the plaintiff the following electroshock treatments: February 10th, 130 volts for four-tenths of a second; February 12th, 120 volts for three-tenths of a second; February 16th, 140 volts for five-tenths of a second; February 20th, 150 volts for six-tenths of a second; February 23rd, 150 volts for six-tenths of a second; all in the year 1954.

After the first treatment the plaintiff immediately suffered and complained of severe pains in his lower back. The pain manifested itself immediately after the plaintiff regained consciousness. Heat treatments and injections for pain were administered. These were repeated daily and shown on the hospital chart which the defendant examined. At no time did he prescribe X-ray or other means by which the cause of the persisting pains might be determined. Notwithstanding the symptoms of back injury manifested immediately after the first treatment, the defendant continued to increase both the intensity and duration of the electroshock treatments.

On his adverse examination which was read into the evidence, the defendant stated: "I know the usual voltage or amperage administered in ordinary shock treatment; it is 120 volts. . . . generally . . . for two-tenths to four-tenths of a second."

Dr. Proctor was graduated as a doctor of medicine in 1945. During his course of study and during his internship he had training in surgery. However, after extensive training he became a specialist in the field of psychiatry. "I am a Fellow in the American Psychiatric Association . . . They have a publication; it is the Journal of The American Psychiatric Association. . . . I subscribe to the American Journal of Psychiatry."

The plaintiff offered for the purpose of having it identified as his Exhibit No. 7, a document entitled: "Standards for Electroshock Treatment," prepared by the Committee on Therapy and approved by the Council of the American Psychiatric Association, May, 1953. In reply to a question by plaintiff's counsel, the defendant stated he was familiar with the contents of the publication and with that part referred to as "Standards for Electroshock Treatment" in 1953. The defendant's objection to the question was sustained. If permitted, the

defendant would have answered, "Yes, sir, I am familiar with it."
"Question: Were the standards that are set forth by the American
Psychiatric Association the same as those which you as a practicing
physician could observe in your practice in this area?" The answer,
if admitted, would have been, "Yes, generally."

Among the standards was the following: "(e) . . . If the patient
should complain of pain or impairment of function, he should receive a
physical examination, including X-ray, to ascertain whether he has
suffered accidental damage." The court refused to admit the questions
and answers, including (e) of the standards offered.

While he was still suffering pain in the lower part of his back, the
plaintiff was discharged from the hospital on February 25, 1954. Two
days later, Dr. Apple, a radiologist, examined plaintiff and by X-ray
discovered the ninth vertebra showed a compressed fracture. "I have
an opinion satisfactory to myself as to the nature and extent of the
fracture. . . . I would classify it as severe or moderately severe." The
witness expressed the opinion the fracture was recent and had occurred
within the last two or three weeks.

Dr. Register, an orthopedic surgeon, examined the X-ray taken by
Dr. Apple, prescribed hospital treatment, a Taylor brace, and con-
finement in bed for six weeks.

The plaintiff testified the pain in his back began immediately fol-
lowing the first treatment and complaints were made to the defendant
and to the nurses and daily recorded in the hospital record. The de-
fendant did not resort to X-ray to determine the nature of the back
injury.

At the conclusion of the plaintiff's evidence, the court entered judg-
ment of involuntary nonsuit. The plaintiff excepted and appealed.

*Cooke & Cooke by William Owen Cooke for plaintiff appellant.*
*Womble, Carlyle, Sandridge & Rice by Irving E. Carlyle, Sapp and*
*Sapp, by Armistead W. Sapp for defendant appellee.*

HIGGINS, J. "A physician who undertakes to render professional
services must meet these requirements: (1) He must possess the de-
gree of professional learning, skill, and ability which others similarly
situated ordinarily possess; (2) he must exercise reasonable care and
diligence in the application of his knowledge and skill to the patient's
case; and (3) he must use his best judgment in the treatment and care
of his patient. (citing many cases) If the physician or surgeon lives
up to the foregoing requirements he is not civilly liable for the con-
sequences. If he fails in any one particular, and such failure is the

proximate cause of injury and damage, he is liable." *Hunt v. Bradshaw,* 242 N.C. 517, 88 S.E. 2d 762.

In this case the plaintiff concedes the defendant possessed the requisite degree of professional learning, skill, and ability properly to diagnose and to treat the plaintiff's ailment. The plaintiff challenges neither the diagnosis made, nor the the treatment prescribed. He does allege, however, that the first shock treatment of 130 volts for four-tenths of a second, given on February 10, 1954, caused a compression fracture of his ninth vertebra, producing severe pain which should have, and did, put the defendant on notice that a fracture was probable. Notwithstanding this notice, the defendant continued to administer shock treatments of increased intensity. These successive treatments added to the plaintiff's injury and increased his damages. Disregarding ample notice of a potential fracture, the defendant negligently failed to make proper examination to determine whether a fracture actually existed. In so doing he failed to exercise due care and his best judgment in the treatments which he had undertaken. *Jackson v. Sanitarium,* 234 N.C. 222, 67 S.E. 2d 57; *Gower v. Davidian,* 212 N.C. 172, 193 S.E. 28; *Nash v. Royster,* 189 N.C. 408, 127 S.E. 356.

The defendant's adverse examination tended to show that usual shock treatment consisted of 120 volts for two-tenths of a second to four-tenths of a second. The first treatment administered to the plaintiff was 130 volts for four-tenths of a second; the second was 120 volts for three-tenths of a second; the third was 140 volts for five-tenths of a second; the fourth and fifth were each 150 volts for six-tenths of a second. According to the defendant's own admission, all except the second were in excess of that usually administered. "After each one, he (the plaintiff) complained of this pain in his back. I gave him something to relieve the pain. . . . I never made an X-ray picture of him while he was there."

Defendant was a Fellow in the American Psychiatric Association. He was familiar with its "Standards of Electroshock Treatment," prepared by the Committee on Therapy and approved by the Council of the Association. These "Standards" were "noncontroversial and reflect the consensus of those who practice electroshock therapy." The "Standards" set are the same as those which a practicing physician could observe in his practice in this area. Among the standards appeared the following: "(e) . . . If the patient should complain of pain or impairment of function, he should receive a physical examination, including X-ray, to ascertain whether he suffered accidental damage."

The defendant was familiar with the standards above referred to. They were fixed by the Association to which he belonged and in which

he was a Fellow. They applied directly to his specialty and to the safety of patients undergoing shock treatment. His acknowledgment of their authenticity and their applicability to the Winston-Salem area were sufficient to warrant their admission in evidence. 32 C.J.S., § 625; *Sanzari v. Rosenfeld,* 34 N.J. 128, 167 A. 2d 625; 20 Am. Jur., § 912, p. 769. "The failure of a physician dealing with an injury involving a potential fracture or dislocation to resort to X-ray views in order to determine the existence and nature of such an injury has frequently been noted as supporting, under the evidence in the particular cases, a finding of negligence in the diagnosis." 54 A.L.R. 2d § 9, p. 297; *Wilson v. Corbin,* 241 Iowa 593, 41 N.W. 2d 702.

The defendant has stressfully argued that nonsuit was required for the reason that *only* the medical evidence of specialists in psychiatry is sufficient to make out a case, and that no specialist in this field was called to testify. Without admitting the soundness of the contention, it overlooks the fact that in this case the "Standards" fixed by the Committee of the American Psychiatric Association with which he was familiar, and which he could have observed, specifically required an X-ray examination in case of pain "to determine whether he has suffered accidental damage." This examination the defendant failed to make. *Hazelwood v. Adams,* 245 N.C. 398, 95 S.E. 2d 917; *Pridgen v. Gibson,* 194 N.C. 289, 139 S.E. 443.

The evidence offered, in combination with that which was improperly excluded, was sufficient to support these conclusions: The plaintiff suffered injury as a result of the first shock treatment. He made immediate complaint of intense pain in his lower back. The subsequent treatments intensified the pain and aggravated the injury. The defendant knew of the persistent sufferings. In these circumstances the evidence of injury was sufficient to put the defendant on notice of a potential fracture. Notwithstanding this notice which X-ray would evidently have disclosed, the defendant made insufficient effort to discover whether a fracture in fact existed. The "Standards" with which the defendant was familiar and which he could and apparently should have observed, required X-ray investigation. This requirement the defendant failed to observe, although he knew that fractures result in 15 to 30 per cent of the cases in which the treatment is administered. The foregoing are permissible inferences which the jury may or may not draw from the evidence. For the court to draw the inferences would invade the province of the jury.

This case was carefully briefed and ably argued. In this opinion the Court has adhered to its rule that in cases in which nonsuit is reversed, the evidence is recited only to the extent necessary to show

the basis for decision. For the reasons discussed, we conclude that the judgment of nonsuit in the court below should be, and is

Reversed.