**Irene M. MORTON, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 618.**

United States District Court
E. D. North Carolina,
Fayetteville Division.

Sept. 18, 1964.

Tally, Tally, Taylor & Strickland, Fayetteville, N. C., for plaintiff.

Robert H. Cowen, U. S. Atty., Alton T. Cummings, Asst. U. S. Atty., Raleigh, N. C., for defendant.

WARLICK, District Judge.

Claiming that she received negligent, improper and careless treatment of her fractured left ankle when it was set and otherwise attended, by members of the Staff of the Womack Army Hospital at Fort Bragg, in the Eastern District of North Carolina, Irene M. Morton, plaintiff herein, prosecutes this action against the defendant, the United States, to recover the sum of $100,000.00, arising from such alleged malpractice on the part of those members of the hospital staff who were assigned to her for treatment, particularly Dr. Charles N. McKenzie, an orthopaedic surgeon. At such time herein set out, Dr. McKenzie was a Captain in the Armed Forces and on the staff of such hospital.

From the hearing had by consent in Raleigh, the following facts are found:

Plaintiff was a military dependant, being the wife of a retired Air Force Colonel. On February 14, 1959 she and her husband were attending an early evening St. Valentine's Day cocktail party held in the General Harvey Room on the second floor of the Main Post Officers' Club at Fort Bragg, honoring a fellow officer, Colonel Autrey, who was being transferred to another post of duty. After about an hour at the party, and when plaintiff had consumed a couple cocktails, she was going downstairs, as would be obvious at such time, to the Ladies' Room, which was located on the first floor of the Club, when the heel of her shoe in some fashion caught in the carpet on the fifth step of the staircase, causing her to fall backward in somewhat of a sitting position, twisting her ankle underneath her and causing her a slight pain. Two officers coming up the steps and sensing plaintiff's predicament asked to be of aid and were told to seek her husband. At such time she informed them that she thought she "had twisted her ankle a little bit, that it was paining a little bit, but it wasn't bad and she thought she should go home."

It was then that a General William Harris, coming on the scene, as plaintiff testified, "took off my shoe and pulled my foot and twisted it. I kind of blacked —the pain was so severe that I kind of lost my senses for a moment and when I said, 'are you a U. S. doctor' he said, 'no, but any fool can see that that leg needs setting.' He said, 'get her to Womack at once.'"

Here possibly for plaintiff's welfare, it would have been much better had General Harris done like the certain priest coming down from Jerusalem toward Jerico, and seeing the man who had fallen among thieves, passed by on the other side, since the evidence tends to show that his action probably brought about, or if not, greatly accentuated plaintiff's fracture.

On plaintiff's husband's arrival on the scene he and others assisted her to the car and she shortly thereafter went home, where she soaked her ankle and packed it with ice.

On the next morning, February 15, around 7:00 o'clock, she was admitted to Womack Army Hospital. There it was found that her ankle was so badly swollen that it could not then be set, whereupon Dr. McKenzie applied a modified swelling

cast and administered drugs for the relief of her pain. However he previously X-Rayed the injured limb and confirmed his diagnosis of a fracture of the ankle with dislocation, specifically a fracture of the lateral malleolus and fracture of the posterior lip of the tibia and posterior dislocation of the talus.

Thereafter and until February 19 she was treated in the hospital by administering different drugs for relief of pain and particularly with respect to special drugs to help reduce the swelling more rapidly in her ankle and placing her on elevation in cold packs applied directly to her ankle in an effort to keep the swelling from increasing. On that date it appeared that the swelling had subsided to the extent that a definitive surgical procedure could be performed. She was then taken to the operating room and under a spinal anesthesia surgical manipulations were performed and she was then immobilized in a long leg cast. But prior to affixing the cast the position and alignment of the injured limb was checked and X-Rays were taken and on such being found to be in proper alignment plaintiff was returned to her ward and thereafter was symptomatically treated for pain, discomfort, and swelling, as is customary following a major surgical procedure.

On February 24 plaintiff was taught to use crutches and on the 26th she was discharged to return home where she was to be assisted for a time at least by someone in the home.

It is further found that as stated by plaintiff in her testimony that during the period she was an in-patient at the hospital Dr. McKenzie and the hospital staff did everything possible to make her comfortable and that her treatment was excellent.

In the meantime as a treatment for her nervousness, Dr. McKenzie prescribed a certain type of tranquilizer to be used as the need would appear and as necessary for a nervous condition.

On March 20 plaintiff again returned to the hospital, X-Rays were taken and showed a satisfactory healing. The position of her bones and her fracture were felt to be satisfactory. It was then that the long leg inversion cast was removed and a cast equipped with a walking heel was applied and further instructions with respect to the use of crutches with partial weight bearing were given.

Again on April 2 plaintiff returned to the hospital at which time she was seen by Dr. McKenzie and on X-Rays being again taken it was noted that she had a stable ankle in so far as manipulation was concerned. That her injured ankle had healed and the walking cast was removed. It appeared that clinically the fracture was stable to manipulation and further X-Rays revealed that the position was good. That though there was not much visible callous, the mortise appeared to be satisfactorily closed. She was thereupon sent to the physical therapy section of the Orthopaedic Clinic for whirlpool baths and exercises, and was then to be permitted to return home and use crutches as necessary, with directions to return for evaluation in one month.

The hospital records disclose that she only returned for prescribed physical therapy treatment three times and that at her request she was given instructions for bathing and exercising her ankle at home.

Plaintiff next appeared at the hospital on August 31, 1959 at which time she was complaining of aching and swelling at the end of each day. X-Rays were made and examinations had and on September 8, 1959 a widening of the joint mortise and some lateral displacement of the talus appeared.

Dr. McKenzie, having served his enlistment, had been discharged from active military service in early June of 1959 and those in charge of the hospital at that time advised her that this disability would continue. Plaintiff was further informed that if her pain and swelling increased to the point that an operation would be of value, that her ankle could then be fused.

Plaintiff again returned to the Womack Hospital on January 15, 1960, however it was then found by those in charge

that her disability did not warrant surgical fusion, but she was advised that if the pain about which she seemed disturbed increased that it would be possible for her to go as she expressed the desire so to do, to Walter Reed Hospital for further study and an operation, if warranted, and as a military dependant.

Plaintiff fell on two occasions, both of which falls came about after September 15, 1959,—one fall occurring in a Winn-Dixis parking lot and the other in the kitchen of her home. Oddly as her testimony shows, each came about when her right leg gave away.

On August 30, 1962, an operation on plaintiff's disabled left ankle was performed by Dr. John Marshall Carter of Huntersville, West Virginia, which from the testimony consisted basically of opening the ankle at two places, removing the debris tissue and calcium that had formed which had resulted from friction between the surfaces of the disabled members, scraping the bone and re-shaping the ankle, and adjusting component members in position with wire and pin to produce a stable ankle over which a cast was fitted. This operation seemingly resulted in a considerable improvement.

Following the operation performed by Dr. Carter, plaintiff subsequently returned to the Womack Hospital for a removal of the pins and treatment of a skin infection which had developed under the cast. Later she visited the hospital for treatment on any number of occasions, a privilege she enjoyed as a military dependant, and for which no charge was ever made other than $1.75 each day for meals served as an in-patient, and living in Fayetteville as she still does, this privilege is a continuing one.

Dr. McKenzie, on graduating in 1955 at the Arkansas School of Medicine, did his internship at St. Vincent's Infirmary in Little Rock, and thereafter entered into the practice of orthopaedic surgery in that city. He went into military service under his enlistment in February 1957, and was discharged in late June of 1959. In view of his specializing in orthopaed-

ics and his studies and experience, in such field, he was assigned to Fort Bragg where he remained for well nigh the whole period of his army service.

The treatment of a broken ankle is not an unusual operation at Fort Bragg since it is the base of the 82 Airborne Division, and obviously a great deal of parachute training is undergone.

Sometimes there are as many as one hundred paratroopers with broken ankles in the hospital at one time, and then again, if maneuvers are not being undergone the number is not as large,—on occasion getting down to as few as forty or fifty cases.

Dr. McKenzie unquestionably is an expert in orthopaedic surgery and was so found without exception by the court.

Contentions:

Plaintiff contends that though the operation performed on her ankle by Dr. McKenzie may have been successful and properly done, that the long leg inversion cast was removed too early, and that resulting proximately from its early removal the opportunity for the ankle bones to lose position was created. That Dr. McKenzie was negligent and careless in such removal and that thereby she suffered such permanent injury to her left ankle as is shown in the evidence.

The defendant contends among other things that the operation was properly performed, and was successful, and that the removal of the long leg inversion cast was standard practice at Womack Hospital and at other hospitals, not only those operated by the government but those privately operated. And that subsequently when X-Rays taken showed proper union the walking cast was likewise a standard practice, and that such injury if any, that plaintiff now seems to suffer, came about through no fault of the defendant or any of those physicians or surgeons who were assigned to her in the hospital. That the treatment at all times accorded the plaintiff was so done and performed as to render to her the best available knowledge which those treating her possessed.

Plaintiff offered the testimony of two orthopaedic surgeons, experts in that field,—one Dr. Walter S. Hunt, who among other things testified that he saw the plaintiff on August 3, 1961; took X-Rays of her injured ankle and found that there was in his opinion a widening joint mortise; further testifying that he had seen the X-Rays taken at Womack Hospital together with the hospital records, and that they indicated generally accepted procedure for setting an ankle with a break of the type sustained by the plaintiff, and that the placing of both casts represented proper procedure. However he stated that though this was standard procedure that he probably would have left the long leg inversion cast on for a longer period of time, though he admitted he had not seen the X-Rays taken of the plaintiff's ankle at the time the casts were removed.

Dr. Hunt further stated that in treatment of ankle fractures over the years that he had on occasion, if not more often, removed a cast prior to six weeks, and that otherwise he had on occasion left them on longer than eight weeks. That the practice is quite variable, and that in this type of injury the treatment is no different for an adult of plaintiff's age over a much younger individual. That a fracture-dislocation is always treated in the same sort of way and that they take approximately the same time to heal, regardless of age.

Dr. John W. Baluss, Jr., also an orthopaedic surgeon, testified as a witness for plaintiff, that he had examined her ankle on March 21, 1961, that he made X-Rays thereof and fully acquainted himself with her situation; that he found nothing that was not standard procedure with respect to the treatment of her broken ankle, though in his opinion had she been his patient, he would have left the long leg inversion cast on for approximately two weeks longer. However there was more than one school of thought in the treatment of such fractures. Dr. Baluss further testified that there are many reasons why broken ankles don't heal as rapidly as might be anticipated and that

he had an opinion that something must have happened to plaintiff's ankle between April 2, 1959 and August 31, 1959, and that such likely was the result of a gradual slip which possibly in his opinion occurred within the first month after the cast was removed, for that it was found to be in correct position from the X-Rays taken on the 2nd of April, 1959. That the practice as shown in the treatment of plaintiff's injury was that regarded as standard in the Fort Bragg area by orthopaedists.

None of the testimony offered in the case shows any evidence of malpractice but indicates a standard procedure varied however by some testimony that the casts in the opinion of the witnesses, had they performed the operation, would not have been removed as early as was done.

From the foregoing findings of fact, I make the following conclusions as a matter of law:

That in a federal Tort Claims case, where jurisdiction is based on a diversity of citizenship, the courts of the United States are to turn to the law of the state for the standards to which a physician is to be held in a malpractice case. Hunt v. Bradshaw, 4 Cir., 251 F.2d 103.

This is a rather distressing case in that the plaintiff is permanently injured it would seem, and will of necessity have a limp and likely will be compelled to use crutches or carry a cane during the remainder of her life.

Yet at the same time the evidence fails to measure up to that standard which would reflect a liability for failure to properly perform a duty owed plaintiff and which through such failure would constitute an act of malpractice on the part of the surgeons charged. The evidence offered shows unquestionably that good judgment was used, that Dr. McKenzie exercised reasonable care and diligence in the application of his knowledge and skill to the plaintiff's case, though the results achieved may not have been that which he sought to bring about.

The standards required by the North Carolina law have been recently

reiterated in Stone v. Proctor, 259 N.C. 633, 131 S.E.2d 297 (1963) and add up to an affirmation of a long line of existing decisions in North Carolina indicating a physician's or surgeon's responsibility. This responsibility is as follows:

"A physician or surgeon who undertakes to render professional services must meet these requirements: (1) He must possess the degree of professional learning, skill and ability which others similarly situated ordinarily possess; (2) he must exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and (3) he must use his best judgment in the treatment and care of his patient. Long v. Austin, 153 N.C. 508, 69 S.E. 500; Nash v. Royster, 189 N.C. 408, 127 S.E. 356; Smith v. McClung, 201 N.C. 648, 161 S.E. 91; Wilson v. Martin Memorial Hospital, 232 N.C. 362, 61 S.E.2d 102; Jackson v. Mountain Sanitarium, 234 N.C. 222, 67 S.E.2d 57. If the physician or surgeon lives up to the foregoing requirements he is not civilly liable for the consequences. If he fails in any one particular, and such failure is the proximate cause of injury and damage, he is liable." Hunt v. Bradshaw, 242 N.C. 517, 88 S.E.2d 762; Stone v. Proctor, 259 N.C. 633, 131 S.E.2d 297.

Later and in 1957 Hunt v. Bradshaw was before the Court of Appeals for the Fourth Circuit where in his opinion Chief Justice Sobeloff, then a Circuit Judge, among other things had this to say:

"A physician or surgeon is not a guarantor of success. He is not liable for an untoward result not foreseeable and not resulting from a lack of due care; the law does not hold him to a standard of infallibility. Nash v. Royster, 1925, 189 N.C. 408, 127 S.E. 356. The surgeon is, however, required to ' * * * exercise reasonable care and diligence in the application of his knowledge and skill to the patient's case; and * * * he must use his best judg-

ment in the treatment and care of his patient.' Hunt v. Bradshaw, 1955, 242 N.C. 517, 88 S.E.2d 762, 765." Hunt v. Bradshaw, 251 F.2d 103.

Taking into consideration the evidence in this case and the applicable law, one must unalterably come to the conclusion that the plaintiff is not entitled to recover. Accordingly she is denied relief.

Counsel will present judgment.