409 P.2d 74

**George A. SHETTER, Appellant,**

v.

**Louise P. ROCHELLE, Appellee.***

**No. 2 CA–CIV 95.**

Court of Appeals of Arizona.

Dec. 17, 1965.

---

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 8479. The matter was referred to this court pursuant to A.R.S. § 12–120.23.

Chandler, Tullar, Udall & Richmond, by Robert S. Tullar, Tucson, for appellant.

Arthur W. Vance, Jr., Tucson, for appellee.

MOLLOY, Judge.

This is an appeal from a judgment rendered in an action by a patient against a doctor for injuries received from an operation in which a cataract was surgically removed from the right eye of the patient.

The complaint sets up three causes of action. The first count is in negligence, the second count alleges that the defendant-surgeon warranted that the operation would turn out successfully and the third count alleges that the defendant failed to warn the plaintiff of any possible bad results from the operation, and " * * * that this misconduct was negligent and wrongful and therefore any consent which the plaintiff may have given is vitiated or nullified."

The court directed a verdict in favor of the defendant on the negligence count at the close of the evidence, and submitted the theory of warranty to the jury, which found against the plaintiff on this issue. A judgment was rendered in favor of the plaintiff and against the defendant on count three in the sum of $10,000.00 and this appeal is from that judgment.

In many respects the evidence is undisputed. Conflicts in the evidence mainly concern what the defendant told or did not tell the plaintiff prior to the operation. Approximately two years before the cataract operation was performed by the defendant, the plaintiff went to the defendant,

who is a practicing ophthalmologist of Tucson, Arizona, for an eye examination. At this time the plaintiff had some concern about the cataracts, because there was a history of cataracts in her family. There were no cataracts found by the doctor at this time but approximately six months before the operation in question, another examination by the defendant-doctor disclosed bilateral, cortical, pre-senile cataracts. The testimony indicated that a cataract is an opacity in the lens of the eye and is not a separate growth, but is caused by the tissue of the lens itself or the thin membrane capsule within which it is contained becoming opaque. That it is not an uncommon malady is demonstrated by the fact that both the defendant-doctor and another ophthalmologist called as a witness in the case testified that they were each performing approximately eighty to one hundred such operations per year.

The plaintiff testified that the defendant described the operation as " * * * very simple * * *," that he told her that there was " * * * no need to worry about it * * *," that she had an essentially healthy eye and that " * * * there was no reason in the world * * *" why she should not " * * * get along fine and have that 20/20 vision and good results," that " * * * all of his patients had recovered and gotten along so well," and that the defendant promised her that she would have 20/20 vision after the operation. (This last contention by the plaintiff was rejected by jury verdict.) The plaintiff further testified that she was told that the operation would have to be performed under general anesthesia, though the plaintiff had requested only a local anesthesia, and that it would take between eight months to one year for the operations of both eyes and the adjustment from the operations. She testified that the operation was explained to her by using a model of an eye in the defendant's office.

There was no contention below nor on appeal that the plaintiff did not understand what surgical procedures would be attempt-ed. She testified that before talking to the doctor she knew that after such an operation she would not be able to lift anything heavy until the time she left the hospital. The plaintiff testified that the defendant informed her that the first thirty-three hours after the operation were the most important and that there would be a special nurse needed for her during this time. The plaintiff was informed not to bring a toothbrush to the hospital because she would not be able to tilt her head to brush her teeth after the operation.

The defendant testified that he could not remember specifically what he had told the plaintiff as to the hazards of the proposed operation but that he "felt" that he had told the plaintiff the same things he usually told his patients—that nine out of ten operations were successful. According to the defendant-doctor better than 95 per cent of such operations are successful. The defendant stated he had told the plaintiff there was no need for her to worry about the operation. Immediately prior to the operation, the defendant testified he warned the plaintiff to remain quiet after the operation and that it was possible to have hemmorrhage, vitreous prolapse, the wound torn open or retinal detachment. He stated no other risks were specifically mentioned.

The defendant's written notes on plaintiff's history indicated that after surgery upon the patient performed by another surgeon some four years before, the plaintiff had become mentally ill, and that he considered the plaintiff to be emotionally unstable but mentally competent. The doctor selected general anesthesia rather than local anesthesia because of his evaluation of the patient's emotional condition. The doctor usually performed such cataract removals under local anesthesia.

On October 27, 1959, defendant operated on the plaintiff's right eye, which was the eye with the most advanced cataract. When she was admitted to the hospital, the plaintiff signed a written consent to " * * * the performing of whatever operation may in the best judgment of the attending phy-

sician be deemed necessary or advisable. * * *"

The lens of the plaintiff's right eye was removed by the defendant with a standard surgical procedure, but the results obtained from the operation have been unsatisfactory. Plaintiff testified that while she was still in the hospital, approximately five days after the operation, she experienced a sharp pain in the right eye. When the defendant examined the eye subsequently he informed the plaintiff that her eye had hemorrhaged. Subsequently, during an office examination by the defendant, the plaintiff testified that he told her that her eye had hemorrhaged again.

The defendant testified plaintiff's right eye suffered a prolapse of the iris on each side of the pupil where the incision had been made. After the operation, the defendant cauterized this together using an acid. There was no testimony that there was anything improper about such procedure.

According to the plaintiff, the defendant continued to tell her that vision in her eye would improve, but such vision has remained continuously blurred. In May 1960, the plaintiff went to Dr. Sherwood Burr, another ophthalmologist in the City of Tucson. At that time the defendant had functional vision in both eyes of "20/200," which was explained by the doctor as being the ability to read only the big "E" on the standard eye chart. The deficiency in the plaintiff's left eye was caused by a cataract of the lens and the deficiency in the vision of the right eye was caused by a "* * * dense gray membrane in the pupilary area," which Dr. Burr diagnosed as being caused by a condensation of the vitreous humor in the anterior portion of the eye. Dr. Burr testified that he had no way of knowing what had caused this condensation and "* * * if prolonged hemorrhage remained in there it could have—could be a contributing factor. * * *" There was no other medical testimony linking this dense gray membrane with any act performed by the defendant.

Dr. Burr testified that he did not know what the standard in the community was insofar as warning patients of the possible bad effects of cataract removal. He stated that one of the important preoperative techniques in all eye surgery is "* . * * to get the confidence of your patient so that she is emotionally in good shape to undertake the operation," and that the percentage of "failure" in cataract operations of this character is between 1 and 3 per cent. Dr. Burr further testified that secondary glaucoma is one of the recognized risks inherent in this surgery, with "* * * a small percentage * * *"; that there are "* * * a whole page full of complications" possible, but none probable and that if one performs such eye operations long enough, eventually the statistics will "* * * catch up * * *" and an unsuccessful operation will occur.

On November 11, 1960, Dr. Burr operated on the plaintiff's other eye and successfully removed the lens from this eye. As a result of this operation the plaintiff's visible vision in the left eye improved to 20/20 vision with a contact lens. Dr. Burr continued to treat plaintiff's right eye also, and it improved to 20/60 vision. However, in February of 1962, the plaintiff came to Dr. Burr complaining of a pain in her right eye. Examination revealed acute glaucoma, a pathological increase in pressure of the aqueous humor of the eye. Dr. Burr testified that in his opinion the glaucoma which resulted was a "secondary" glaucoma and probably resulted from the operation performed by the defendant, though there was no way of knowing this. This condition required surgery to relieve the pressure and in the operation performed by Dr. Burr there was some repair work performed upon the prolapsed iris. After the remedial operation, which successfully corrected the glaucoma, the vision in the eye has returned to 20/200. Dr. Burr is doubtful that the eye will improve in the future.

Dr. Emery Royce, an opthalmologist called by the defendant, testified that in eye

operations of this type there is approximately a 1 per cent chance of an unsuccessful result with the best of surgeons and that with surgeons of less skill there was a higher percentage of failure.

The three medical doctors who testified agreed that one of the common hazards of this type of an operation is hemorrhaging in the eye, the incidents of such being variously reported in medical literature as between 2 and 25 per cent of the cases, but that usually such hemorrhaging is absorbed and does not result in any serious consequences.

There was no testimony from the plaintiff that she would not have submitted to the eye operation by the defendant had she known of the risks inherent in the operation. Nor was there any showing that there had been any advancements made in eye surgery between the time of the plaintiff's first cataract operation in October 1959 and her second in November 1960 so as to make the inherent risks of the operation any less.

In submitting the case to the jury the court instructed:

"A physician has the duty to a patient arising out of the relationship to warn the patient of reasonable and recognized risks inherent in an operation which the doctor anticipates performing upon the person of the patient.

"A physician violates his duty to his patient if he withholds any facts which are necessary to form the basis of an intelligent consent by the plaintiff to the proposed operation.

\* \* \* \* \* \*

"When an adult patient is in possession of his faculties and in such physical health as to be able to consult about his condition and no emergency exists making it impractical to confer with him, his consent is necessary to authorize a surgical operation upon himself. If a surgeon performs an operation on such person without his consent, he will be liable in damages for any injury resulting from the operation."

All of these instructions were appropriately objected to by defendant. The defendant took the position that he could only be liable if he was guilty of negligence and if such negligence was a proximate cause of any injury to the plaintiff. All of the defendant's instructions in this area were refused by the court, over objection.

At the conclusion of the evidence, the defendant made a motion for a directed verdict, and after the verdict a motion for a judgment non obstante veredicto or, in the alternative, for a new trial, on the grounds that there was no substantial evidence of either negligence or a willful tort, and that there was no evidence of any causal connection between the alleged failure to warn and the plaintiff's injuries. In support of his motion the defendant contended that the evidence conclusively showed that the plaintiff would have proceeded with the operation upon her eye even though she had known of the inherent risks established by the evidence. All of these motions were denied by the trial court and the rulings of the court are properly raised by assignments of error in this court.

■  The issues of negligence and warranty having been determined in the lower court adversely to the plaintiff's claims, the judgment for the plaintiff can be predicated only upon the theory that her injuries were received from hazards inherent in the operation itself. A physician is presumed to have had the skill and knowledge normally possessed by those qualified physicians in his profession and to have used such skill in treating his patients. Stallcup v. Coscarart, 79 Ariz. 42, 282 P.2d 791 (1955). This presumption controls this court in the light of the rulings and verdict below.

The label to be placed upon the plaintiff's cause of action has caused considerable discussion in the briefs. The plaintiff has labeled her cause of action as one of "\* \* \* technical assault and battery \* \* \*." A review of the trial court's rulings indicates that it considered count three to be one in battery.

It seems to be well-established that if a doctor operates upon a patient without his patient's consent, that he has committed a battery upon the patient and is liable in damages therefor. Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, 52 L.R.A., N.S., 505 (1914); Mohr v. Williams, 95 Minn. 261, 104 N.W. 12, 1 L.R.A., N.S., 439 (1905); Pratt v. Davis, 118 Ill.App. 161, aff'd 224 Ill. 300, 79 N.E. 562, 7 L.R.A., N.S., 609 (1906); Rolater v. Strain, 39 Okl. 572, 137 P. 96, 50 L.R.A., N.S., 880 (1913); Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958).

The general rule has been stated at 76 A.L.R. 562:

"The general rule seems to have become well established that, before a physician or surgeon may perform an operation upon a patient, he must obtain the consent either of the patient, if competent to give it, or of someone legally authorized to give it for him, unless immediate operation is necessary to save the patient's life or health, although under exceptional circumstances the consent may be regarded as having been impliedly given. (The action for operating without consent seems usually to be regarded as one for assault or trespass, rather than for negligence)"

Whether this same law has pertinency to a case such as this, in which the patient has given consent to the operation performed but under what is alleged to be a mistake of fact as to risks inherent to the operation is the question before this court.

Unfortunately, the leading cases dealing with the failure of a surgeon to warn of inherent risks do not always make it clear as to what theory supports recovery, when recovery is permitted. An example of such a decision is Natanson v. Kline, 186 Kan. 393, 350 P.2d 1093 (1960), rehearing decision 187 Kan. 186, 354 P.2d 670 (1960). This case appears to have been submitted to the jury on a negligence theory. The plaintiff had requested and been refused by the trial court an instruction to the effect that the relationship of physician and patient was a fiduciary one, requiring a full disclosure of any hazards of the proposed treatment which are known to the physician, and that the failure to so disclose such hazards would make the defendant " * * * guilty of negligence" (350 P.2d 1093, 1099).

However, in its opinion, the Kansas Supreme Court said:

"We are here concerned with the case where the physician is charged with treating the patient without consent on the ground the patient was not fully informed of the nature of the treatment or its consequences, and, therefore, any 'consent' obtained was ineffective."

350 P.2d 1093, 1102.

In other places in the opinion, the court speaks of liability for " * * * unauthorized treatment" (350 P.2d 1093, 1103), and of the right of " * * * self-determination," which makes each man the " * * * master of his own body * * *" (350 P.2d 1093, 1104), and of the necessity for an " * * * intelligent consent * *" or an " * * * informed consent * *" (350 P.2d 1093, 1106), in order for the doctor to have "authority" to perform the operation in question. Among the cases cited in Natanson is Bang v. Charles T. Miller Hospital, 251 Minn. 427, 88 N.W.2d 186 (1958), which was an assault case in which liability was allowed because of the severance of spermatic cords when the patient had consented only to a prostate operation.

In the same decision, however, Natanson states:

"The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances."

350 P.2d 1093, 1106.

The court further stated that on retrial the plaintiff's negligence instruction:

" * * * should be modified to inform the jury that a physician has such discretion, as heretofore indicated, consistent with the full disclosure of facts necessary to assure an informed consent by the patient."

350 P.2d 1093, 1107.

The rehearing opinion in Natanson (354 P.2d 670, 673) states:

"Negligence is an essential element of malpractice, and the foregoing statement recognizes that a causal relation must be established by the patient, between the negligent act of the physician and the injury of the patient, to sustain the burden of proof where damages are sought in a malpractice action for injury."

The rehearing opinion makes it clear that the Kansas Supreme Court is holding that Dr. Kline, under the facts of this case, "* * * *as a matter of law* * * *" (emphasis in original) 354 P.2d 670, 673, failed in his duty to make disclosures to his patient and that the only issue of fact that should be submitted to the jury on retrial is that of proximate causation. In this connection the court stated:

"*If*, of course, *the appellant would have taken the cobalt irradiation treatments even though Dr. Kline had warned her* that the treatments he undertook to administer involved great risk of bodily injury or death, *it could not be said that the failure of Dr. Kline to so inform the appellant was the proximate cause of her injury.*" (Emphasis added.) 354 P.2d 670, 673.

The ambivalence as to legal theories indulged in by the Natanson decision was the chief inspiration of the law review article, Duty of Doctor to Inform Patient of Risks of Treatment: Battery or Negligence?, by Marilyn R. Davis, 34 So.Calif. L.Rev. 217 (1961).

Other decisions have been more precise as to legal theory and have denied recovery for the reason that the plaintiff sued in negligence rather than for battery. Hunt v. Bradshaw, 242 N.C. 517, 88 S.E.2d 762 (1955). In this case, the trial court had directed a verdict for the defendant at the close of the plaintiff's case. The plaintiff contended that the doctor had represented the operation as "simple" whereas it was a serious one and involved undisclosed risks. In affirming, the appellate court indicated that in order to establish negligence there must be expert testimony, of which there was none. In its dicta, the court indicated that if the plaintiff had sued for assault and battery, a different question would have been presented and perhaps a different result reached.

At least one decision in this area appears to be predicated upon the law of battery. Bowers v. Talmage, 159 So.2d 888 (3d D. C.A.Fla.1963). This court said:

"Unless a person who gives consent to an operation knows its dangers and the degree of danger, a 'consent' does not represent a choice and is ineffectual."

159 So.2d 888, 889.

Other decisions prefer to categorize the liability found to exist as being simply "malpractice." Salgo v. Leland Stanford Jr. University Bd. of Trust., 154 Cal.App.2d 560, 317 P.2d 170 (1957); Woods v. Brumlop, 71 N.M. 221, 377 P.2d 520 (1962).

There are several appellate decisions, in which there was testimony that the doctor did not diclose some known risks, which hold that, as a matter of law, under the particular circumstances, the consent given was an "informed" consent and was effectual. Williams v. Menehan, 191 Kan. 6, 379 P.2d 292 (1963), dealt with representations by the doctor that " * * * there was absolutely no danger in the operation." (379 P.2d 292, 295) The patient in this case died after an injection of sodium pentothal in the bloodstream through a heart catheter.

There was expert testimony that there is "* * * some risk * * *" in the procedure performed. (379 P.2d 292, 295) The decision, in affirming the trial court's sustaining a demurrer to the plaintiff's evidence, states:

> "*The evidence clearly shows that plaintiffs were informed of the nature of the procedure and of the things the doctors were undertaking to do. They had the facts upon which to base their decision, and we are of the opinion the parents were fully informed.* The record is devoid of any standard of care required of the defendant doctors, much less any violation of such standards, known or unknown.
>
> "The evidence introduced by the plaintiffs was wholly insufficient to establish a case of liability against any of the defendants. It also was insufficient to permit a jury to speculate as to what the defendants should or should not have done.
>
> "The facts in this case are unlike the facts in the Natanson case. There Dr. Kline made no disclosure whatsoever, and the treatment was new and very dangerous; *while in the instant case Dr. Menehan advised plaintiffs of the procedure sufficiently to constitute an informed consent.* There was no evidence of this operation being extremely hazardous; no evidence of any death resulting from such an operation or any malpractice in performing the exploratory treatment. No evidence of fault or breach of proper medical standards was established against the defendant doctors. There is nothing in this action to detract from the rules of law laid down in the Natanson case." (Emphasis added)

379 P.2d 292, 295.

Decisions reaching similar results are: Amerine v. Hunter, 335 S.W.2d 643, 646 (Tex.Civ.App.1960); Carroll v. Chapman, 139 So.2d 61 (La.App.2d Dist.1962); Russell v. Jackson, 37 Wash.2d 66, 221 P.2d 516 (1950); and Kenny v. Lockwood, Ont.L.R. 141, 1 D.L.R. 507 (1932).

A number of cases have held that regardless of whether the theory be negligence or assault there must be expert testimony in order to establish liability for failure to make disclosures. Carroll v. Chapman, 139 So.2d 61 (La.App.2d Dist.1962); Amerine v. Hunter, 335 S.W.2d 643 (Tex.Civ.App. 1960); Govin v. Hunter, 374 P.2d 421, 424 (Wyo.1962); Di Filippo v. Preston, 3 Storey 539, 53 Del. 539, 173 A.2d 333 (1961); Haggerty v. McCarthy, 344 Mass. 136, 181 N.E.2d 562, 94 A.L.R.2d 998 (1962); Roberts v. Young, 369 Mich. 133, 119 N.W.2d 627, 99 A.L.R.2d 1330 (1963). Other cases, under the particular circumstances presented, have held expert testimony to be unnecessary for recovery. Natanson v. Kline, supra; Woods v. Brumlop, supra; Mitchell v. Robinson, 334 S.W.2d 11 (Mo.1960).

All of the cases coming to this court's attention, with the exception of Bowers v. Talmage, supra, recognize that the physician must, because of the psychosomatic aspects of the practice of medicine, have some discretion in what the patient is told insofar as the hazards of the operation contemplated are concerned. Woods v. Brumlop would limit this discretion to unusual circumstances as to which the doctor would have the burden of proof.

One trial judge has phrased this need for some discretion as follows:

> "Doctors frequently tailor the extent of their preoperative warnings to the particular patient, and with this I can find no fault. Not only is much of the risk of a technical nature beyond the patient's understanding, but the anxiety, apprehension, and fear generated by a full disclosure thereof may have a very detrimental effect on some patients." Roberts v. Wood, 206 F.Supp. 579, 583 (So.Dist.Ala.1962)

An interesting article is one by Charles C. Lund, M. D., The Doctor, The Patient,

And The Truth, 19 Tenn.L.Rev. 344 (1946). This article suggests that a doctor's duty to "do no harm" to the patient must take precedence at times over the duty to tell the patient the truth.

One writer in this field has noted the possibility that a physician may be subject to liability by making a complete disclosure:

"Indeed, it might be argued that to make a complete disclosure of all facts, diagnoses and alternatives or possibilities which may occur to the doctor could so unduly alarm the patient that it would constitute bad medical practice. This is suggested by the results of two recent cases, Ferrara v. Gulluchio [Galluchio] [5 N.Y.2d 16 [176 N.Y.S.2d 996], 152 N.E.2d 249 [71 A.L.R.2d 331], 1958] and Furniss v. Fitchett, [N.Z.L.R. 398, 1958], decided respectively in New York and New Zealand during the past year, in which disclosure by a doctor of the facts known to him and of future possibilities gave rise to severe reactions on the part of the patient." McCoid, The Care Required of Medical Practitioners, 1959, 12 Vand.L.Rev. 549, 590.

In contrast, Woods v. Brumlop, supra, and Bowers v. Talmage, supra, have reasoned from the fact that the relationship between a physician and his patient is one of trust and confidence [1] to the conclusion that there is a duty to disclose all pertinent facts relative to the treatment prescribed, including all " * * * reasonable and recognized risks inherent * * * " in a proposed operation. This seems to this court to be a non sequitur. The major premise is, of course, sound. There is the confidential relationship. Morrison v. Acton, 68 Ariz. 27, 198 P.2d 590 (1948). But whether such relationship requires a full disclosure would seem to be intimately related to what the duties of the trustee are under the particular trust relationship. In the case of a physician, this would be largely determined by what is considered good medical practice. The first duty of any trustee is to act with undivided loyalty to the trustor. 90 C.J.S. Trusts § 247c(1), p. 232; 54 Am.Jur. 246, Trusts § 311. Most authorities dealing with this particular problem have come to the conclusion that there is a patent possibility of conflict between doing what professional standards have established as in the best interests of the patient and the duty to make full disclosure. Most cases hold that the doctor's loyalty to the best interests of the patient must be given consideration in the formulation of a rule of law pertaining to disclosures and that a breach of duty on the part of the physician is not made out by merely establishing a nondisclosure of possible failures inherent in a contemplated surgical procedure. Natanson v. Kline, supra; Salgo v. Leland Stanford Jr. University Bd. of Trust., 154 Cal.App.2d 560, 317 P.2d 170 (1957); and cases in annotation beginning 79 A.L.R.2d 1028.

While this court does not believe that a label placed upon a cause of action has any great significance, it does believe that theories of liability still have substance, and that the instant case particularly points up that substance. In order to make one man liable for another's injury, there must be some valid reason for so doing. This reason, or theory of liability, may very well determine what injury has resulted from the wrong committed. A person should be liable for no more than the injury caused by his wrong.

If the consent given to the operation in question was ineffectual, every phase of this operation, from initial anesthesia to final suture, was a continuing battery for which recovery should be allowed, *even if the operation had been successful.* The operation itself, under such

1. Woods v. Brumlop, supra, cites, along with other cases, in support of this proposition, Batty v. Arizona State Dental Board, 57 Ariz. 239, 112 P.2d 870 (1941).

circumstance, is the wrong. The Restatement, Second, Torts states this law in § 13:

"So too, a surgeon who performs an operation upon a patient who has refused to submit to it is not relieved from liability by the fact that he honestly and, indeed, justifiably believes that the operation is necessary to save the patient's life. Indeed, the fact that medical testimony shows that the patient would have died had the operation not been performed and that the operation has effected a complete cure is not enough to relieve the physician from liability."

(From Comment *c.*)

See also § 15, Restatement, Second, Torts (1965).

The foregoing results from the inescapable principle stated by Judge Cardozo in Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 105 N.E. 92, 93, 52 L.R.A.,N.S., 505:

"Every human being of adult years and sound mind has a right to determine what should be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." 105 N.E. 92, 93.

■ However, if the plaintiff's claim is for "malpractice," whether one be considering liability in the field of negligence, or liability arising from the breach of a fiduciary duty, which would be contractual, or regarding it as a "hybrid" action (e. g., Maercklein v. Smith, 129 Colo. 72, 266 P.2d 1095 (1954)), then the damages which flow from such a breach are different because the wrong is different. The operation itself in this situation is *not* the wrong, but rather the *failure to disclose,* a duty arising out of the fiduciary relationship of physician-patient. Under malpractice theories, there would be no damage proximately resulting from the failure to disclose unless the plaintiff would *not* have had the operation *if the disclosures had been made.* Nat-

anson v. Kline, 186 Kan. 393, 350 P.2d 1093 (1960); Govin v. Hunter, 374 P.2d 421, 423 (Wyo.1962); Amerine v. Hunter, 335 S.W.2d 643 (Tex.Civ.App.1960). This is an application of the fundamental "but for" rule, which comes as close to being of the essence of the proximate cause doctrine as any concept. The principle is incorporated in the Restatement, Second, Torts § 432. Concurrence is found in Harper & James, The Law of Torts, § 20.2. It is the law of this state. Alires v. Southern Pacific Company, 93 Ariz. 97, 378 P.2d 913 (1963). One expression of the rule is by Dean Prosser:

"On the other hand, an act or omission is not regarded as a cause of an event if the particular event would have occurred without it."

Prosser, Torts (3d ed.) p. 242.

■ Proof of proximate causation is upon the plaintiff. Nieman v. Jacobs, 87 Ariz. 44, 347 P.2d 702 (1959). In this case, not only is there an absence of such proof, but facts in evidence tend to negate the causal connection. The fact that the plaintiff proceeded to have this operation upon her other eye by another surgeon, presumably after she was fully informed of the inherent risks to this operation, is some evidence that disclosure by the defendant of inherent risks would not have deterred her from having the earlier operation. The risks of injury are not so great as to cause most reasonable persons to decline to have such a beneficial operation performed, one that has such a good chance of restoring the sight of a substantially nonfunctional eye to an eye capable of 20/20 vision with the aid of a lens. The plaintiff's failure to testify on this subject is itself indicative to some degree. 2 Wigmore, Evidence § 289, p. 171 (3d ed. 1940).

We believe that, if the theory of battery be inapplicable, the plaintiff failed to make out a case insofar as proximate cause is concerned, and the motions for a directed verdict and for judgment made by the defendant should have been granted.

We have been cited no decision of our Supreme Court bearing upon this troublesome question as to when a consent to an operation becomes ineffectual. Our Supreme Court has said that when the law of this jurisdiction has not been established, the law of the Restatement of Torts will be looked upon with favor. Reed v. Real Detective Pub. Co., 63 Ariz. 294, 162 P.2d 133 (1945); MacNeil v. Perkins, 84 Ariz. 74, 324 P.2d 211 (1958); Maricopa County v. Leppla, 89 Ariz. 220, 360 P.2d 227, 84 A.L.R.2d 1129 (1961). We are in a field of the law that is not only not established in this jurisdiction, but, as we have seen, is in a state of some uncertainty in many jurisdictions. Accordingly, this court is particularly prone to accept the view of the Restatement of Torts.

The question presented here is whether a consent to an operation is effectual, if the consentor adequately understands the nature and extent of the operation, but is under a misapprehension as to possible failures which are inherent in the operation. Several sections of the Restatement, Second, Torts bear upon the question. Section 55 reads as follows:

"Fraud or Mistake as to Harmful or Offensive Character of Contact

"The rule stated in § 892B(1) as to consent induced by fraud or mistake *as to the essential character of conduct* applies to fraud or mistake as to the harmful or offensive character of a contact." (Emphasis added.)

The only illustration given under this section is:

"1. A consents to being touched by B with a piece of metal which is heavily charged with electricity. B knows that it is so charged, and that A is ignorant of the fact, either because B or some third person has misrepresented it to him, or because A has made a mistake for which no one else

is responsible. A's consent is not effective to prevent B's liability for battery."

Another section having pertinency is § 57 reading as follows:

"Fraud or Mistake as to Collateral Matter

"The rule stated in § 892B(2) as to consent induced by fraud or mistake as to a collateral matter not affecting the essential character of the conduct applies to intentional invasions of interests of personality." [2]

Illustration No. 3 under this section reads as follows:

"3. A, a surgeon, induces B to submit to a treatment of his eyes by falsely representing that the treatment will cure his vision. *A's sole purpose is to obtain a fee.* If the treatment involves nothing more than harmless touching of B's eyes, A is not liable to B. If it involves any pain or physical harm, A's fraud makes him subject to liability to B even though the treatment is otherwise properly given." (Emphasis added.)

There have been only two volumes of the Restatement of the Law, Second, Torts, published to this date. The Introduction to these volumes, p. VII, states that:

"They supersede the first two volumes of the original Restatement, which are concerned with the same subjects."

Both of the two sections of the new Restatement quoted above refer to § 892 of this new work. But, the volume in which § 892 will be contained is as yet unpublished. Because of this anomalous situation, the court believes it proper to examine the pertinent sections in the first Restatement:

"§ 55.

"An assent to a bodily contact under a mistake as to its harmful or offensive character, is not a consent if the

---

2. The Restatement makes it clear that "interests of personality" include "the interest in freedom from harmful bodily contacts"—see Introductory Note to ch. 2, Assault and Battery, p. 22, Vol. 1, Restatement, Second, Torts.

mistake is known or should be known to the actor."

\* \* \* \* \* \*

"Illustration:

"1. A assents to B touching him with a piece of metal which is heavily charged with electricity. B knows that it is so charged and that A is ignorant of this fact. A's assent is not an effective consent to B's touching him with the piece of metal."

"§ 57.

"An assent to an invasion substantially the same as that inflicted, is a consent although it is given under a mistake as to a collateral matter induced by the fraudulent misrepresentations of the actor or otherwise known by him."

"*Comment:*

"*a. What constitutes collateral matter.* A mistake as to a collateral matter *is a mistake which does not affect the other's realization of the nature of the invasion inflicted* upon him but which leads him to assent to an invasion the nature of which he knows *because he is led to believe it is to his advantage to assent thereto.*" (Emphasis added.)

"*b. Liability for bodily harm when assent fraudulently obtained.* The fact that an assent is procured by fraudulent misrepresentations of a collateral matter does not prevent it from being effective to protect the actor from such liability as is predicated solely upon the fact of the intentional invasion. The purely dignitary interests of personality, such as the interest in freedom from a merely transitory confinement, are protected only against intentional and unpermitted invasion. *Therefore, the assent, though procured by fraud, protects the actor from liability.* On the other hand, interest in freedom from bodily harm is protected from any form of conduct which is intended or likely to cause it. *Therefore, while the fraudulently procured assent protects the actor from liability predicated upon the mere fact that the contact has been inflicted,* he is still subject to liability for any bodily harm which results from the contact to which he has fraudulently induced the actor to submit, *not because of any lack of consent to the contact, but because of the fraudulent,* and therefore tortious, means by which the assent has been procured, with knowledge that the contact will or may prove harmful."

(Emphasis added.)

"Illustrations:

\* \* \* \* \* \*

"3. A, a surgeon, induces B to submit to a treatment of his eyes by falsely representing that the treatment will cure his vision. *A's sole purpose is to obtain a fee.* If the treatment involves nothing more than harmless touching of B's eyes, A is not liable to B. If it involves any pain or physical harm, A's fraud makes him liable to B even though the treatment is otherwise properly given." (Emphasis added.)

The reading of these sections as a whole convinces this court that it is the intent of the Restatement to lay down a rule similar to that of Williams v. Menehan, supra, quoted previously in this opinion. A consent is not rendered ineffectual if the consentor understands the essential character of the operation to be performed. This we believe was the case here. There is no showing that this was a particularly dangerous operation or that the risks were inordinately great. The unfortunate results achieved by plaintiff were not probable, but only possible. All reasonable people must understand that there is some risk inherent in surgery and particularly so in a case of surgery as delicate as this.

In view of the phychosomatic problems involved in disclosure by the doctor, we refuse to hold, as did the lower court, that failure to disclose all " \* \* \*

reasonable and recognized risks * * *" inherent in an operation ipso facto renders a consent ineffectual. This is too great a penalty to inflict upon a surgeon seeking to "do no harm." And, because of the emotional frailties of the human species, we do not believe such a rigid rule is in the best interests of society.

Fraud on the part of the defendant-physician was neither alleged in the complaint nor in any way pressed in the trial court nor on appeal. Illustration 3 under §§ 57 of both the Restatement of Torts, First and Second, above quoted, is therefore not before us. Citizens Utilities Co. v. Firemen's Ins. Co., 73 Ariz. 299, 240 P.2d 869 (1952); Valley Nat. Bank of Phoenix v. Siebrand, 74 Ariz. 54, 243 P.2d 771 (1952).

Summarizing, we hold that a consent to a surgical procedure is effectual if the consentor understands substantially the nature of the surgical procedure attempted and the probable results of the operation. This, as a matter of law, constitutes an informed consent. Lacking this, the operation is a battery unless some special exception pertains.[3] Given an informed consent, liability, if any, must be predicated in malpractice. In malpractice, the duty of the physician to disclose is determined by the normal practices of his profession in the particular community. We do not attempt to determine the law in the case of particularly dangerous operations, when some courts have ruled as a matter of law that disclosure must be made. Natanson v. Kline, supra, and Mitchell v. Robinson, supra. If it is found that the standard of disclosure has been breached in the particular case, and if injury has resulted therefrom, then there is liability in malpractice. Whether there was sufficient evidence in this case, arising from the testimony of the defendant-doctor or otherwise, to go to the jury on the question of whether the defendant-doctor breached a duty to disclose we need not decide because there is no showing here that the

failure to disclose resulted in the plaintiff's unfortunate condition.

The judgment is reversed.

KRUCKER, C. J., and HATHAWAY, J., concurring.

---

3. As for instance, when an operation is performed under certain emergency conditions. See Restatement, Second, Torts § 62.