Mary BOWERS and Robert Bowers
husband and wife

v.

Samuel GARFIELD, M.D.

Civ. A. No. 72–264.

United States District Court,
E. D. Pennsylvania.

Sept. 17, 1974.

**504**

William C. Hewson, Philadelphia, Pa., for plaintiffs.

Lowell A. Reed, Jr., Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

In this case, the jury found for the doctor in a medical malpractice suit brought on the theory that a hysterectomy had been performed without obtaining the patient's informed consent. Although post-trial motions were not filed timely, plaintiffs have taken an appeal. I am preparing this opinion so that the Court of Appeals may be advised of my views on the issues involved: causation standards under Pennsylvania law, the use of medical texts in cross-examination, and the receipt of a pre-trial memorandum in evidence to impeach an expert witness.

Plaintiff, Mrs. Mary Bowers, first consulted defendant, Samuel Garfield, M.D., on December 5, 1969. At that time she complained of recurrent vaginal bleeding since the delivery of her fourth and last child.[1] Following an evaluation of Mrs. Bowers, which included a pelvic examination, Dr. Garfield recommended that she undergo a hysterectomy, or surgical removal of her uterus.

On February 8, 1970, Mrs. Bowers was admitted as a patient to Frankford Hospital in Philadelphia, where on the following day Dr. Garfield removed her uterus, left fallopian tube, and left ovary. Mrs. Bowers remained in the hospital until February 26, 1970, during which time she developed abdominal distention, jaundice, fever, anemia attributed to hemorrhage into her abdominal cavity, and a vesicovaginal fistula, i. e., an abnormal opening between her bladder and vagina. The vesicovaginal fistula persisted after plaintiff's discharge from the hospital.

Mrs. Bowers was examined by a urologist, and on August 24, 1970, she was admitted to another hospital and the fistula was successfully repaired by surgery. Mrs. Bowers and her husband then brought the present action against Dr. Garfield for malpractice.[2] By appropriate answers to written interrogatories the jury concluded that:

(1) Dr. Garfield was not negligent in recommending and performing a hysterectomy on Mrs. Bowers;

(2) Dr. Garfield had not advised Mrs. Bowers of the risk of a vesicovaginal fistula;

(3) A reasonable woman, had she been advised of the risk of a vesicovaginal fistula, nevertheless would have undergone a hysterectomy; and

---

1. Mrs. Bowers had had nine pregnancies, five of which terminated in miscarriages. Her last living child was delivered by cesarean section in May of 1969, at which time a tubal ligation was performed for the purpose of sterilization.

2. Mrs. Bowers also named Frankford Hospital as a defendant in her original complaint. The suit was dismissed, however, by stipulation, as to Frankford Hospital on February 5, 1973.

(4) Dr. Garfield had adequately explained to Mrs. Bowers alternative methods of treatment to a hysterectomy.

On the basis of these findings, judgment was entered in favor of the defendant and against the plaintiffs. Plaintiffs contend that three evidentiary rulings, the submission of "Question Number 3", and the trial court's charge to the jury thereon constitute reversible error.

## I. *Use of the Objective Standard*

■ The jury determined that even though Dr. Garfield had not informed Mrs. Bowers of the risk of a vesicovaginal fistula, a reasonable woman, aware of such a risk, would have proceeded with the operation nevertheless. Plaintiffs contend that the submission to the jury of the objective standard of causation, i. e., the standard of a "reasonable woman," was error. In plaintiffs' view, if considered at all,[3] the causation question should have been decided on a subjective basis, that is, would Mrs. Bowers herself have undergone the hysterectomy had Dr. Garfield advised her of the risk of a vesicovaginal fistula.

In the absence of a Pennsylvania decision on point, my task was to predict what the Supreme Court of Pennsylvania would hold on this question. Costello v. Schmidlin, 404 F.2d 87 (3d Cir. 1968); Davis v. Smith, 126 F.Supp. 497 (E.D.Pa.1954), affirmed, 253 F.2d 286 (3rd Cir. 1958). The leading Pennsylvania case dealing with informed consent is Gray v. Grunnagle, 423 Pa. 144, 223 A.2d 663 (1966), in which the Pennsylvania Supreme Court announced a broad but workable rule:

(1) where a physician or surgeon can ascertain in advance of an operation alternative situations and no immediate emergency exists, a patient should be told of the alternative possibilities and given a chance to decide what should be done before the doctor proceeds with the operation;

(2) the doctor is under a duty to advise the patient adequately on the dangers to be anticipated as a result of the operation and not to minimize them;

(3) the plaintiff has the burden to prove the operation performed had not been authorized.[4]

Cooper v. Roberts, 220 Pa.Super. 260, 286 A.2d 647 (1971), allocatur denied, dealt with what constitutes an informed consent. There the Superior Court stated:

A more equitable formulation would be: whether the physician disclosed all those facts, risks and alternatives that a *reasonable man* [emphasis added] in the situation which the physician knew or should have known to be the plaintiff's would deem significant in making a decision to undergo the recommended treatment. This gives maximum effect to the patient's right to be the arbiter of the medical treatment he will undergo without either requiring the physician to be a mind-reader into the patient's most subjective thoughts or requiring that he disclose *every* risk lest he be liable for battery. The physician is bound to disclose only those risks which a *reasonable man* [emphasis added] would consider material to his decision whether or not to undergo treatment. This standard creates no unreasonable burden for the physician.

220 Pa.Super. at 267–268, 286 A.2d at 650.

3. Both at trial and on the present appeal, plaintiffs have contended that a causal relationship between failure to disclose and the injury complained of is unnecessary and irrelevant. This stance is clearly contra to the weight of modern authority in the area of informed consent. See Canterbury v. Spence, 150 U.S.App.D.C. 263, 464 F.2d 772 (1972), cert. denied 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518; Fogal v. The Genesee Hospital, 41 A.D.2d 468, 344 N.Y.S.2d 552 (1973); Cobbs v. Grant, 8 Cal.3d 229, 502 P.2d 1, 104 Cal.Rptr. 505 (1972); Wilkinson v. Vesey, R.I., 295 A.2d 676 (1972); Sharpe v. Pugh, 270 N.C. 598, 155 S.E.2d 108 (1967); Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74 (1965).

4. See also Dunham v. Wright, 423 F.2d 940 (3d Cir. 1970), which restated the rule articulated in *Gray* and emphasized a physician's duty to disclose possible adverse consequences.

Following the logic of *Cooper*, it is my opinion that Pennsylvania courts, as several other courts already have done, would adopt the objective standard on the issue of causation.

The preeminent federal case on point is Canterbury v. Spence, 150 U.S.App. D.C. 263, 464 F.2d 772 (1972), cert. denied 409 U.S. 1064, 93 S.Ct. 560, 34 L. Ed.2d 518. Dealing squarely with the issue of causation and the standard to be applied in its determination, the court stated:

> [A]s in malpractice actions generally, there must be a causal relationship between the physician's failure to adequately divulge and damage to the patient.
>
> A causal connection exists when, but only when, disclosure of significant risks incidental to treatment would have resulted in a decision against it. *The patient obviously has no complaint if he would have submitted to the therapy notwithstanding awareness that the risk was one of its perils* . . . The more difficult question is whether the factual issue on causality calls for an objective or a subjective determination.
>
> \*　\*　\*　\*　\*　\*
>
> We think a technique which ties the factual conclusion on causation simply to the assessment of the patient's credibility is unsatisfactory . . . [W]hen causality is explored at a post-injury trial with a professedly uninformed patient, the question whether he actually would have turned the treatment down if he had known the risks is purely hypothetical: 'Viewed from the point at which he had to decide, would the patient have decided differently had he known something he did not know?' And the answer which the patient supplies hardly represents more than a guess,

perhaps tinged by the circumstances that the uncommunicated hazard has in fact materialized.

> In our view, this method of dealing with the issue on [sic] causation comes in second-best. It places the physician in jeopardy of the patient's hindsight and bitterness. It places the factfinder in the position of deciding whether a speculative answer to a hypothetical question is to be credited. It calls for a subjective determination solely on testimony of a patient-witness shadowed by the occurrence of the undisclosed risk.
>
> *Better it is, we believe, to resolve the causality issue on an objective basis: in terms of what a prudent person in the patient's position would have decided if suitably informed of all perils bearing significance.* If adequate disclosure could reasonably be expected to have caused that person to decline the treatment because of the revelation of the kind of risk or danger that resulted in harm, causation is shown, but otherwise not. [footnotes omitted and emphasis added]. 464 F.2d at 790–791.

Accord: Fogal v. The Genessee Hospital, 41 A.D.2d 468, 344 N.Y.S.2d 552 (1973); Cobbs v. Grant, 8 Cal.3d 299, 502 P.2d 1, 104 Cal.Rptr. 505 (1972).[5]

Moreover, in cases where a patient has died as the result of an unforewarned consequence of a medical treatment, application of the subjective standard would bar recovery in all but a handfull of cases since the injured person's testimony, essential to a decision on a subjective basis, would be unavailable. Having reexamined Cooper v. Roberts, Canterbury v. Spence, and the other cases cited, I am persuaded that I correctly instructed the jury to apply the objective "reasonable woman" test.

5. Compare Wilkinson v. Vesey, R.I., 295 A. 2d 676 (1972) where the court implicitly adopted the causality requirement heretofore described, but apparently opted for the less rigorous subjective standard in making the causation determination. Citing Shetter v. Rochelle, 2 Ariz.App. 358, 409 P.2d 74 (1965), the court held that in order to prevail in an action where recovery is based upon the doctrine of informed consent the plaintiff must prove that if he had been informed of the material risk, he would not have consented to the procedure and that he had been injured as a result of submitting to the procedure.

## II. Use of Learned Treatise to Impeach Defendant on Cross-Examination

Plaintiffs contend that I erred in sustaining defendant's objection to the attempted use by plaintiffs' counsel, on cross-examination of the defendant, of a learned treatise to impeach the defendant's credibility. Specifically, Dr. William C. Hewson, plaintiffs' attorney, confronted Dr. Garfield with a medical text which the defendant had recognized as authoritative in his deposition. Dr. Hewson instructed the defendant to read a designated paragraph to himself, and then asked him whether he agreed with it. When Dr. Garfield expressed some disagreement with the passage, Dr. Hewson asked him to read it aloud. Defense counsel thereupon objected and the following interchange between plaintiffs' counsel and me took place:

"Dr. Hewson: If he agrees as to a reputable authoritative textbook it is perfectly proper to impeach him from

. . .

"The Court: No, he doesn't. It may be a reputable textbook in 99 out of 100 things that it says, but that 100th thing he may not agree with what it says.

"Dr. Hewson: I think that is what the whole purpose of the textbook is (sic) used for impeachment purposes.

"The Court: No; I will sustain the objection."

(N.T. 4–102–03.)

This ruling paralleled an earlier ruling which I made when defendant was seeking to cross-examine plaintiffs' expert. On that occasion, counsel for plaintiff objected to the use of a learned treatise for purposes of cross-examination (N.T. 2–155, 2–156, 2–157, and 2–159). I sustained the objection when the witness indicated he did not agree with the statement in question (N.T. 2–167–69).

The use of learned treatises in the examination of expert witnesses is without doubt an evolving area of the law of evidence and one in which there is little uniformity in the United States. See generally McCormick on Evidence (2d ed.), [hereinafter cited as McCormick] § 321; Annot., 60 A.L.R.2d 77. While such treatises are, when offered to prove the truth of the matters contained therein, clearly hearsay, 6 Wigmore, Evidence §§ 1690–1708; McCormick § 321, at 743, Wigmore and others have argued vigorously for a learned treatise exception to the hearsay rule. 6 Wigmore, Evidence §§ 1690–1692; McCormick § 321, at 743, 745; Rule 803(18), Proposed Rules of Evidence for United States Courts and Magistrates; Rule 63(31), Uniform Rules of Evidence, adopted from Rule 529 of the Model Code of Evidence.

Nevertheless, most courts have been unwilling to adopt a broad hearsay exception for treatises and other professional literature. McCormick § 321, at 744; Advisory Committee's Note to Rule 803(18), Proposed Rules of Evidence for United States Courts and Magistrates. Wigmore acknowledges a number of reasons for this reluctance: (1) printed material is likely to be outdated because of rapidly shifting professional skills and knowledge; (2) a trier of fact is likely to be confused when confronted with data intended for a professionally-trained reader; (3) the possibility of lifting sections of material out of context creates the danger of unfair use; (4) since most matters of expertise are in reality matters of skill rather than academic knowledge of the sort likely to be conveyed to the written page, witnesses testifying in person are likely to be more reliable than textual material; and (5) most fundamentally, the author of the text is unavailable for cross-examination. 6 Wigmore § 1690.

Notwithstanding certain statements made by the Supreme Court in Reilly v. Pinkus, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949)[6] there are in the United States today four broad lines of authori-

---

6. *Pinkus* could be read to authorize the broad use of texts in the cross-examination of medical experts. It has not uniformly been construed so, however. Several cases have interpreted *Pinkus* to allow such use only where the expert has based his opinion to some degree upon his reading, e. g., Dolcin Corp. v. Federal Trade Commission, 94

ty concerning the use of learned treatises in the cross-examination of expert witnesses. Most courts allow such use where the expert has relied upon the authority in question in forming his opinion. McCormick § 321, at 743; Annot., 60 A.L.R.2d 77, 81–87. Some courts extend the rule to situations where the expert acknowledges reliance upon some general authorities, although not the particular authority sought to be introduced to impeach him. McCormick § 321, at 743; Annot., 60 A.L.R.2d 77, 87–93. Other courts allow any material which the expert acknowledges to be authoritative to be used to impeach him. McCormick § 321, at 743; Annot. 60 A.L.R.2d 77, 94–98. And some courts permit the use regardless of the witness's reliance on or acknowledgement of the work as authoritative, if the cross-examiner establishes the work's reputability by proof or judicial notice. McCormick § 321, at 743; Annot. 60 A.L.R.2d 77, 98–104; Rule 803(18), Proposed Rules of Evidence for United States Courts and Magistrates.

It has been held that the scope of cross-examination of a medical expert with respect to his knowledge of a particular subject by reference to medical works on which the expert has not relied as authority for his testimony is largely within the sound discretion of the trial court. Woelfle v. Connecticut Mut. Life Ins. Co., 103 F.2d 417 (8th Cir. 1939); cf. Rules 104(a) and 403 and Advisory

Committee's Notes, Proposed Rules of Evidence for United States Courts and Magistrates; Dolcin Corp. v. Federal Trade Commission, 94 U.S.App.D.C. 247, 219 F.2d 742 (1955), cert. denied 348 U.S. 981, 75 S.Ct. 571, 99 L.Ed. 763.

Inasmuch as I previously had prohibited plaintiffs' expert from reading on cross-examination a selection from a journal on obstetrics and gynecology which the expert recognized as authoritative, N.T. 2–166–67, the substantial rights of neither party were advanced nor prejudiced.[7] Moreover, since my earlier ruling came in response to an objection raised by plaintiffs' counsel, his subsequent complaint about an identical ruling against him appears, to say the least, to be contradictory.

Finally, plaintiffs' expert testified at length and could easily have cited authorities upon which he relied, or which were in accord with his opinion. Simply stated, plaintiffs had ample opportunity to demonstrate that there were authorities in disagreement with defendant's opinion. Therefore, even if the challenged ruling may not have followed the most liberal rule, such error was harmless.

### III. Use of Medical Article by Defense Counsel in Cross-Examination of Plaintiffs' Expert Witness

Plaintiffs' next allegation concerns the interrogation of plaintiffs' expert witness, Dr. George Lewis, through use

U.S.App.D.C. 247, 219 F.2d 742 (1954), cert. denied 348 U.S. 981, 75 S.Ct. 571, 99 L.Ed. 763 (1955). Other cases have read *Pinkus* as authorizing cross-examination of experts on the basis of learned treatises regardless of whether the witness has relied on them in formulating his opinion, e. g., Lawrence v. Nutter, 203 F.2d 540 (4th Cir. 1953); Stottlemire Cawood, 215 F.Supp. 266 (D.C. 1963). Still other cases cite yet the same language in *Pinkus* as authority for the minimal due process rights to be accorded at an administrative "fair hearing," e. g., Jeffries v. Olesen, 121 F.Supp. 463 (S.D.Cal.1954).

7. 28 U.S.C. § 2111 provides:
   On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the

record without regard to errors or defects which do not affect the substantial rights of the parties.
And Rule 61, Fed.R.Civ.P., states:
   No error in either the admission or the exclusion of evidence and no error or defect in any ruling . . . is ground for granting a new trial or for setting aside a verdict . . . unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

of a medical article, "The Elusive Adenomyosis of the Uterus—Revisited" by Drs. Bird, McElin, and Monalo-Estrella, published in the March 1, 1972 issue of the American Journal of Obstetrics and Gynecology.

■■ A trial judge has broad discretion in the admission or exclusion of expert evidence. Salem v. United States Lines Co., 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313, rehearing denied 370 U.S. 965, 82 S.Ct. 1578, 8 L.Ed.2d 834 (1962); Idzojtic v. Pennsylvania R. Co., 456 F.2d 1228 (3d Cir. 1972). And the opposing party may cross-examine an expert on matters of credibility, interest, or bias. Rao v. Hillman Barge & Construction Co., 326 F.Supp. 1091 (W. D.Pa.1971), aff'd 467 F.2d 1276 (3d Cir. 1972).

■ Although many questions which seemed to be based on the article were propounded to plaintiffs' expert, all that he answered were of a preliminary nature—that is, how research is carried on and reported, whether basic research methods have recently changed, and what procedures are used to examine tissue specimens. When it came to the point where he was asked to read a passage with which he did not agree, the objection of plaintiffs' counsel was sustained (N.T. 2–167–69). Thus, nothing from the article was revealed to the jury —except those items that the expert considered to be valid and correct.

There was no prejudice to the plaintiffs from this cross-examination of their expert.

IV. *Use of the Pretrial Order to Impeach Defendant's Expert Witness*

On cross-examination, defendant's expert witness, Dr. Kaign Smith, stated that he initially became acquainted with

Mrs. Bowers' medical history in September of 1973 (N.T. 4–42, 4–43). Plaintiff thereupon sought to introduce into evidence the pretrial order for this case, (N.T. 4–68, 4–71), which was filed with the court on March 13, 1973, and which listed Dr. Smith as a witness for the defense. Plaintiffs contend that the date-discrepancy between the pretrial order and Dr. Smith's testimony suggested at least two unfavorable inferences: either the witness was not telling the truth regarding his first contact with the case, or defense counsel was confident that Dr. Smith would testify on behalf of the defendant regardless of the facts since they were unknown to Dr. Smith in March, 1973, when the pretrial order was filed.

■ Although I twice offered to permit plaintiffs' attorney to examine Dr. Smith on this point outside the presence of the jury, (N.T. 4–69, 4–70), at least until it could be determined whether the witness could shed any light on the discrepancy, plaintiffs' counsel rejected both offers (N.T. 4–71). At that juncture, upon defendant's objection, and exercising the broad discretion entrusted to a trial judge regarding the admission of potentially misleading and confusing evidence, Smith v. Spina, 477 F.2d 1140 (3d Cir. 1973); United States v. Ravich, 421 F.2d 1196 (2d Cir. 1970), I refused to admit the pretrial order.

■ Rule 43(a) of the Federal Rules of Civil Procedure embodies a broad policy favoring the admissibility of evidence. Had plaintiffs' counsel chosen to avail himself of my permission to interrogate Dr. Smith outside the presence of the jury initially—and had he at that time been able to establish relevancy—admissibility of the pretrial order arguably could have been premised on 28 U.S.C. § 1733(a).[8]

---

8. Were these federal authorities insufficient to warrant admission of the pretrial order, obliging the court to apply the law of evidence of the forum state, Galbraith v. Hartford Fire Ins. Co., 464 F.2d 225 (3d Cir. 1972), admission would have proven less likely. Even assuming that a pretrial order is a "consolidated pleading" Clark v. United States, 13 F.R.D. 342, 344 (D.Ore.1953), having evidentiary value, at least on appeal, Robertson v. Malone, 190 F.2d 756, 758–759 (5th Cir. 1951), under Pennsylvania practice, although pleadings determine the issues, they are primarily not evidence for any pur-

Several intertwining considerations prompted me to curtail plaintiffs' questioning of Dr. Smith on the issue of the pretrial order. First, I entertained serious doubt about the relevancy of the proposed interrogation. Relevant evidence must in some degree advance the inquiry and thus have probative value, Stauffer v. McCrory Stores Corp., 155 F.Supp. 710 (W.D.Pa.1957). Although a witness may be questioned as to any fact within his knowledge, it must be relevant to the issues joined in the proceeding which is the subject of the litigation at bar. Moran v. Pittsburgh-Des Moines Steel Co., 6 F.R.D. 594 (W.D.Pa.1947). Nevertheless, even quite relevant evidence may be excluded where it will serve largely to prejudice, confuse, or mislead the jury. See Shepard v. United States, 290 U.S. 96, 104, 54 S.Ct. 22, 25–26, 78 L.Ed. 196 (1933); Smith v. Spina, 477 F.2d 1140, 1146 (3d Cir. 1973).

In the case of Dr. Smith, I doubted whether he could explain the appearance of his name on the pretrial order,[9] or, indeed, whether he could even be expected to know what a pretrial order is. Moreover, since the defendant had changed counsel during the interim between the pretrial order and the trial,[10] and the attorney responsible for listing Dr. Smith's name on the pretrial order was not in court, I was further persuaded that Dr. Smith's credibility might be damaged in the eyes of the jury on a matter about which he legitimately had no knowledge and which was completely irrelevant to his testimony. Plaintiff's counsel's refusal to question the witness outside the presence of the jury to establish relevance left me no alternative to sustaining defendant's objection. No harm would have come to the plaintiffs had their counsel availed himself of my offer; great prejudice might have resulted to the defendant had I permitted the introduction of the pretrial order in the absence of an adequate foundation for it.

For the foregoing reasons, I believe the verdict rendered by the jury and the judgment entered thereon should be affirmed.

pose unless made so by statute, Dektor v. Overbrook Nat. Bank of Philadelphia, 10 F. Supp. 894, 895–896 (E.D.Pa.1934); Buehler v. United States Fashion Plate Co., 269 Pa. 428, 433, 112 A. 632, 634 (1921); Skillman v. Magill, 98 Pa.Super. 72 (1930). Plaintiffs cited no case, nor has my research disclosed any, wherein a pretrial order as held admissible for purposes of impeachment.

9. As I indicated to counsel, Dr. Smith's name could well have been listed by the attorney representing Dr. Garfield at the time of the filing of the pretrial order either inadvertently or without consulting the witness, N. T. at 4–70.

10. On May 9, 1973, the appearance of William J. O'Brien, Esquire, of the firm of Pepper, Hamilton & Scheetz, for the defendant was withdrawn, and the appearance of Rawle & Henderson, was filed. Lowell A. Reed, Jr., Esquire, of Rawle & Henderson represented the defendant at trial and on the appeal presently before the Court of Appeals.